RYAN, Plaintiff in error, v. STATE, Defendant in error.

*No. 75-868-CR. Argued June 2, 1977.—Decided July 1, 1977.*
(Also reported in 255 N. W. 2d 910.)

For the plaintiff in error there was a brief and oral argument by *Gerald P. Boyle* of Milwaukee.

For the defendant in error the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

BEILFUSS, C. J.   The defendant Ryan contends sec. 946.12 (5), Stats., is unconstitutionally vague and unconstitutional as applied to the facts of this case.  He also

contends it was error to admit his testimony taken at the John Doe proceeding in evidence at his trial.

The statute in question is titled "Misconduct in public office." The subsection with which he was charged is as follows:

"Any public officer or public employe who does any of the following may be fined not more than $500 or imprisoned not more than one year or both: . . .

"(5) Under color of his office or employment, intentionally solicits or accepts for the performance of any service or duty anything of value which he knows is greater or less than is fixed by law."

The evidence introduced at the trial is not in dispute in any material respect.

In the spring of 1974, a John Doe proceeding was convened in the Circuit Court for Milwaukee County to investigate the transfer of liquor licenses in the City of Milwaukee. The facts which led to Ryan's conviction centered around the issuance and renewal of a Class B liquor license for a restaurant known as Mama Mia's, and a dog grooming license for the same location, both in Alderman Ryan's ward.

A Class B alcoholic liquor license is necessary to dispense liquor on a retail basis. Because of the quota law which limits the number of licenses to approximately 1,650, the city does not issue additional licenses. Usually anyone attempting to obtain a liquor license for nonlicensed premises must get a transfer from a present license-holder.

An application for a Class B liquor license must be submitted to the City License Clerk. The Milwaukee Police Department is asked to investigate the application and, in some cases, the State of Wisconsin, Department of Justice may take a position on whether the license should be granted. A hearing on the license application is held before the Utilities and License Committee, a subcommittee of the Milwaukee Common Council. Notice of the

hearing is given to the applicant, the application is advertised as required by law and notice of the application is given to the alderman in whose district the new liquor license would be located. The application itself contains a space for an indication of whether the local alderman approves the license application. In 1972 the custom was that if an alderman opposed granting a liquor license in his or her district, the application for the license would be denied. The committee makes a recommendation to the Common Council as to whether the license should be granted. The Common Council then votes on whether to adopt the committee report. The committee report usually includes a great many applications and they are not considered individually by the council.

Liquor licenses must be renewed annually. After the license is originally granted, renewal is almost automatic unless there have been neighborhood complaints concerning the holder of the license, the holder of the license has been convicted of a crime, or if public improvements have changed the neighborhood. Only ten to twenty-five percent of the license-holders seeking renewal appear before the Utilities and License Committee. The City License Clerk and his staff make the determination on which renewal applicants need a hearing.

In March, 1972, one of the corporate owners of Mama Mia's Restaurant, Alvin Fernandez, initiated efforts to obtain a Class B liquor license. He obtained a list of people who did not renew their liquor licenses from the City License Clerk. He also contacted Alderman Ryan. He told Ryan his name and stated he was from Mama Mia's. He thanked Ryan for okaying his application for a liquor license and approving his obtaining the license. Ryan informed Fernandez that he did not know him and had other business in his office; he stated he would get back to him but he did not. At that time Ryan knew nothing about Fernandez' application.

Fernandez found someone who was willing to "sell" a nonrenewed license, and in October, 1972, purchased the license, contingent upon his application being approved by the Common Council. A corporation, Papa Mia, Ltd., was formed to obtain the liquor license. Because Fernandez was not a Milwaukee resident the license could not be issued to him. The registered agent for the corporation was Fernandez' mother-in-law, Leona A. Papko. She was a Milwaukee resident and the application for the license was made in her name.

The application for the license was made on October 9, 1972. Papa Mia, Ltd., was informed that the present zoning would not permit the granting of a liquor license to Mama Mia's. In November, Fernandez, his attorney and Leona Papko attended a Utilities and License Committee meeting concerning the application for Mama Mia's. Before the license application for Mama Mia's was considered, the committee acted upon another application. Someone that Fernandez believed to be an alderman made a strong recommendation that the license under consideration not be renewed. The committee then recommended that the license be cancelled. From this observation Fernandez concluded that the alderman had the power to prevent a license renewal. The committee then considered the Mama Mia application for the license and it was approved contingent upon a zoning change or variance and approval by the full council. Subsequently the area was zoned for local business which permitted the liquor license. Ryan was not a member of the Utilities and License Committee, nor was he present at the meeting.

Prior to the grant of the license, Ryan was informed that Mama Mia's was applying for a license and he received a copy of the letter to Papa Mia, Ltd., indicating that the present zoning would not permit the grant of a liquor license. Every application for a liquor license con-

tains the question—"Does local alderman recommend this transfer?" Mama Mia's application indicated that the local alderman, Ryan, approved the transfer. An applicant could answer that question "Yes" without consulting the alderman. However the City License Clerk consulted with Ryan about the necessary zoning change if Mama Mia's was to obtain a license; therefore the applicant had no reason to believe that the answer on the application that the local alderman recommended the liquor license transfer was not accurate.

In 1973 and 1974, Mama Mia's license renewal applications were routinely approved without hearing.

In October or November of 1972, Fernandez' attorney introduced him to Ryan. The meeting was very brief with discussion limited to "small talk." After Fernandez learned that the Common Council approved his liquor license, he telephoned Ryan. Fernandez thanked Ryan for "granting [his] liquor license." Fernandez testified that the following conversation took place:

"A. Mr. Ryan answered, and I said, 'Hello.' I said, 'Mr. Mark Ryan?' He said, 'Yes.' I said, 'This is Al Fernandez from Mama Mia Restaurant.'
"Q. What then was said by you or by him?
"A. I said, 'I would like to thank you for granting my liquor license.'
"Q. What if anything else was said?
"A. He said, 'Oh, that's all right,' I said, 'I would like to do something for you but I don't want to construe it as a bribe. I have some gift certificates I would like to send you. Could they be construed as a bribe?' He laughed, and he said, 'No, you are permitted to send me a Christmas gift.'
"Q. What if anything was said or done after that?
"A. He said he really didn't need it, I should send it to his wife."

In December, 1972, Fernandez sent two gift certificates from Milwaukee clothing stores, each worth $150, to Mr. and Mrs. Ryan. In June, 1973, Fernandez again

telephoned Ryan. He stated he wanted to open a dog grooming business on the same premises and had the Health Department's permission. Ryan, noting that Fernandez ran a clean business, stated he had no objection. In December, 1973, Fernandez mailed two more gift certificates, each worth $150, to Mr. and Mrs. Ryan. All four gift certificates were used by the Ryans in February, 1974.

Subsequent to the John Doe proceeding, Ryan was charged with a violation of sec. 946.12(5), Stats., and was convicted by a jury.

Ryan argues that sec. 946.12(5), Stats., is unconstitutionally vague on its face. He notes:

"It is a maxim of constitutional law that:
" 'A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' *Connally vs. General Construction Co.*, 269 U.S. 385, 391, (1926) 46 S. Ct. 126, 70 L. Ed. 322."

However,

"The test of vagueness of a penal statute is whether it gives reasonable notice of the prohibited conduct to those who would avoid its penalties. . . .

"Vagueness rests upon the procedural due-process requirement of a fair notice and the defendant cannot hypothesize fact situations but is confined to the conduct charged when it is so obviously within the zone of prohibited conduct that no reasonable man could have any doubt of its criminality. [Cases omitted.]" *State v. Driscoll*, 53 Wis.2d 699, 701–02, 193 N.W.2d 851 (1972). *Accord, State v. Courtney*, 74 Wis.2d 705, 709–11, 247 N.W.2d 714 (1976).

Sec. 946. 12(5), Stats., cited above and broken down to its component parts, is as follows:

1. Any public officer or public employee

2. Who under color of his office or employment
3. Intentionally
4. Solicits or accepts
5. For the performance of
6. Any service or duty
7. Anything of value
8. Which he knows is greater or lesser than is fixed by law
9. Is guilty of misconduct in public office

On the nine elements, the first four are drawn with specificity. The latter five are not as specific but they are not so broad that they fail to give notice of prohibited conduct to a reasonable person who would avoid its penalty. The words have a commonly accepted meaning. A reading of this section demonstrates that the legislature intended to proscribe the acceptance of a thing of value not provided by law for the performance of a duty. This it did with constitutional specificity; the statute is not unconstitutional on its face.

There is nothing vague about any of these elements considered individually, and when combined they give reasonable notice of the prohibited conduct. "The fact that a statute fails to itemize with particularity every possible kind of conduct which would violate such statute does not make it constitutionally vague." *State v. Givens*, 28 Wis.2d 109, 117, 135 N.W.2d 780 (1965). *Accord*, *State v. Killory*, 73 Wis.2d 400, 405–06, 243 N.W.2d 475 (1976).

Ryan also argues that the statute was unconstitutionally applied. He focuses on the statement of the district attorney in closing argument to the jury that "[y]ou wouldn't be here today if that was a sausage received by Mr. Ryan." Ryan argues that this means

some gifts are acceptable while others are unacceptable, and this makes the statute, as applied, unconstitutional. That statement was no more than a recognition by the district attorney of his quasi-judicial discretion in determining when to prosecute.[1] The import of the district attorney's statement was that a gift of a sausage was *de minimis* and that the gift here was substantial.

Ryan argues that because there is no standard concerning gifts which are unacceptable as compared to those that are acceptable, the statute is unspecific and unconstitutional. There is a standard and it is simple. *Anything of value* which is accepted and known to be greater or lesser than what is fixed by law for a particular duty or service subjects the public officeholder to prosecution for violation of this section. This does not mean that the public officeholder can never accept a gift. Sec. 946.12 (5), Stats., is only violated when that which was accepted was "for the performance of any service or duty." Any officeholder who accepts anything of value, even if it be a sausage for such a reason, subjects himself or herself to the possibility of prosecution.

Ryan makes two additional arguments. The first is that the acceptance of the gift certificates by Ryan did not violate sec. 946.12(5), Stats., because this section was intended to prohibit the acceptance of *fees* which are greater or lesser than fixed by law and because it was directed at acceptance by a public employee holding an administrative position.

There is no question that the acceptance and use of the gift certificates under the circumstances here violates a public trust and the ethical and moral standards expected of public officers. The question is whether the defendant Ryan violated the statute under which he was

[1] *State v. Johnson,* 74 Wis.2d 169, 173–74, 246 N.W.2d 503 (1976), citing *State ex rel. Kurkierewicz v. Cannon,* 42 Wis.2d 368, 378–79, 166 N.W.2d 255 (1969).

charged. A majority of the court believes the evidence is sufficient to prove he did and that the statute is sufficiently clear to give him notice that his conduct would violate it and subject him to its penalties.

The defendant Ryan, as alderman, was a public officer. His entire association with Fernandez was because he was an alderman. He intentionally accepted and used gift certificates valued at $600. The jury could reasonably infer that Fernandez intended to give the certificates for services rendered by Ryan in approving or not rejecting the license applications and that Ryan accepted them as such. Ryan had a duty as an alderman to vote upon the recommendations of the license committee, which he did. His salary was fixed by law. The jury could infer that he accepted the $600 worth of certificates as a greater compensation than was fixed by law for his services as an alderman.

The minority of the court finds the statute troublesome in that it was not designed to prohibit and penalize a public officer from accepting a gift under the circumstances of this case. They reason that this statute was designed to prohibit public officers or employees from accepting fees of a greater or lesser amount than fixed by law for the issuance of a license or performance of a public duty. Certainly one who did accept a greater or lesser fee than fixed by law for a license or a service would violate this statute. The major concern of the minority as to the application of the statute to facts at hand is that it is unconceivable that a public officer, such as an alderman, would take less than his fixed salary for the performance of his duty in connection with the issuance of a license.

The district attorney did not charge Ryan with a violation of the bribery statute,[2] probably because Ryan was not induced to act in the performance of his public duty either by the acceptance of a thing for value or a promise

---

[2] *See* sec. 946.10, Stats.

of such. The offer and acceptance of the gift came after Ryan had performed his public duty and therefore did not influence him to vote one way or the other on Fernandez' application.

The minority believes that if the legislature intended to prohibit a public official from taking a gift as distinguished from a bribe it should adopt an "anti-gift" statute that clearly spells out the prohibition.

While the majority does not find fault with the caveat to the legislature, it does, as stated above, conclude the acts of Ryan violated the statute as it now exists.

Ryan argues he was a potential target-defendant at the John Doe proceeding and, as such, should have been told he was a target, and if he is not so told his John Doe testimony cannot be utilized against him at trial. Ryan and Fernandez testified at the John Doe proceeding. Ryan states he testified after Fernandez and when he testified he was not told that the district attorney had before him all the evidence that was utilized to prosecute. This court does not have the John Doe record before it, therefore it cannot determine whether the district attorney had such information. Assuming that the district attorney did have that information, the issue becomes whether he was bound to disclose to Ryan that he had become a "target."

A John Doe hearing is a statutory proceeding.[3] A witness may have counsel present and may claim the con-

---

[3] "968.26 *John Doe proceeding*. If a person complains to a judge that he has reason to believe that a crime has been committed within his jurisdiction, the judge shall examine the complainant under oath and any witnesses produced by him and may, and at the request of the district attorney shall, subpoena and examine other witnesses to ascertain whether a crime has been committed and by whom committed. The extent to which the judge may proceed in such examination is within his discretion.

stitutional provision against self-incrimination.[4] If the privilege is claimed, testimony may be compelled if transactional immunity is granted.[5] As a measure of due process, a witness is entitled to some protection against self-incrimination. The protection afforded is the privilege against self-incrimination itself. The statute gives any John Doe witness the right to have counsel present to advise him so that he can intelligently assert his self-incrimination right.

In a recent United States Supreme Court opinion, *United States v. Washington* (decided May 23, 1977), the issue decided was whether testimony given by a grand jury witness suspected of criminal conduct may be used against him in subsequent prosecution of the suspected offense when the witness was not informed in advance of his grand jury testimony that he was a potential defendant in a criminal action. The defendant was advised he had a right to remain silent but apparently had no counsel present with him contrary to the case here. The court did not accept the premise that a grand jury interrogation "... '... contains inherently compelling pressures which work to undermine the individual's will to

---

The examination may be adjourned and may be secret. Any witness examined under this section may have counsel present at the examination but such counsel shall not be allowed to examine his client, cross-examine other witnesses or argue before the judge. If it appears probable from the testimony given that a crime has been committed and who committed it, the complaint shall be reduced to writing and signed and verified; and thereupon a warrant shall issue for the arrest of the accused. Subject to s. 971.23, the record of such proceeding and the testimony taken shall not be open to inspection by anyone except the district attorney unless it is used by the prosecution at the preliminary hearing or the trial of the accused and then only to the extent that it is so used."

[4] *State ex rel. Newspapers, Inc. v. Circuit Court*, 65 Wis.2d 66, 72, 221 N.W.2d 894 (1974). *See generally State v. Doe*, 78 Wis.2d 161, 254 N.W.2d 210 (1977).

[5] Sec. 972.08(1), Stats.

resist and compel him to speak where he would not otherwise do so freely.'" Nor did the court decide what, if any, Fifth Amendment warnings were constitutionally required. It did hold that in view of the warnings given, the Fifth Amendment was not violated and the grand jury testimony was admissible at a subsequent trial. It seems in Wisconsin we afford greater protection to the John Doe witness by allowing him to have counsel present.

In *State ex rel. Jackson v. Coffey*, 18 Wis.2d 529, 544, 118 N.W.2d 939 (1963), this court held that the statute did not require that a witness be advised as to the nature of the proceeding. Nor does it require that a witness be advised he is a "target" of the investigation. Ryan was subpoenaed to testify. He appeared with his present counsel, an experienced criminal law attorney, and was advised of his rights. Rather than invoking the privilege against self-incrimination, he chose to testify. He was aware at that time that his testimony could be used in a subsequent criminal proceeding. Due process was satisfied by the presence of counsel and the right to claim the privilege against self-incrimination.

Ryan's final argument is that he should be granted a new trial in the interest of justice. The trial commenced on September 8, 1975. The jury was sequestered. On September 10th it was discovered that Ryan's counsel, Gerald P. Boyle, was bleeding internally. He attempted to continue representing Ryan but in the early morning hours of September 12th he was hospitalized. On Monday, September 15th, the defense moved for a mistrial because Boyle was unable to continue his representation of Ryan.

The court noted that the circumstances were sufficient grounds for granting the motion but decided not to do so. It noted that Attorneys John Carter and James Schaefer

had been involved in the defense since the outset and could adequately continue the representation of Boyle.

The request to this court for a new trial in the interest of justice is often made but seldom granted. That is because ". . . 'a new trial in the interest of justice will be granted only if there has been an apparent miscarriage of justice and it appears that a retrial under optimum circumstances will produce a different result.' " *Garcia v. State,* 73 Wis.2d 651, 654, 245 N.W.2d 654 (1976). Considering all the evidence, it is doubtful that a new trial would produce a different result, therefore a new trial in the interest of justice is not appropriate.

*By the Court.*—Judgment and order affirmed.