BALISTRERI, Plaintiff in error, v. STATE, Defendant in error.

*No. 76–100–CR. Argued February 8, 1978.—Decided May 2, 1978.*
(Also reported in 265 N. W. 2d 290.)

444

For the plaintiff in error there were briefs and oral argument by *David E. Lasker* of Madison.

For the defendant in error the cause was argued by *Pamela Magee-Heilprin,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

CALLOW, J. The defendant, Anthony G. Balistreri, brings this writ of error to review his conviction of endangering the safety of another, one Fred Timmermann, contrary to sec. 941.30, Stats. He was sentenced to two and one-half years' imprisonment. The prosecution arose out of an automobile pursuit of the defendant by the Milawukee police. The pursuit occurred on October 23, 1974, in downtown Milwaukee in rush-hour, weekday traffic. It ended when the defendant's car collided head-on with a car being driven by citizen Fred Timmermann. The defendant seeks review of the conviction on the grounds that the endangering safety of

another statute, sec. 941.30, Stats., is unconstitutionally vague and, alternatively, that the properly admissible evidence was insufficient to convict.

## I. *IS SEC. 941.30, STATS., UNCONSTITUTIONALLY VAGUE?*

The defendant was convicted of violating sec. 941.30, Stats., which provides:

"941.30 **Endangering safety by conduct regardless of life.** Whoever endangers another's safety by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be fined not more than $1,000 or imprisoned not more than 5 years or both."

The defendant contends that this statute is void for vagueness because it failed to inform him of what conduct would "evince a depraved mind."[1] Furthermore, the defendant argues the construction given to this phrase by this court has not only failed to cure, but has actually exacerbated, the vagueness of the statutory language.

■

The concept of vagueness rests on the principle that procedural due process requires fair notice and proper standards for adjudication. *State v. Courtney,* 74 Wis.2d

---

[1] In *State v. Weso,* 60 Wis.2d 404, 412–3, 210 N.W.2d 442 (1973), this court was faced with the identical question of whether sec. 941.30, Stats., is unconstitutionally vague. In *Weso* the court refused to reach the issue because (1) the defendant in that case had not properly preserved it at trial, and (2) the court did not consider the claim of vagueness sufficiently meritorious to resort to its discretionary power of reversal in the interests of justice under sec. 251.09, Stats. In this case the defendant has preserved his claim of error based on the vagueness of sec. 941.30, Stats., by the appropriate pre- and post-trial motions. Therefore, the issue of whether sec. 941.30, Stats., is unconstitutionally vague is now squarely before this court.

705, 709, 247 N.W.2d 714 (1976), *citing: Grayned v. City of Rockford,* 408 U.S. 104, 108–9 (1972). " 'A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' " *Ryan v. State,* 79 Wis.2d 83, 90, 255 N.W.2d 910 (1977), *quoting: Connally v. General Construction Co.,* 269 U.S. 385, 391 (1926); *State v. Vlahos,* 50 Wis.2d 609, 615, 184 N.W.2d 817 (1971). However, a criminal statute need not delineate every mode of conduct within its terms. *State v. Killory,* 73 Wis.2d 400, 405, 243 N.W.2d 475 (1976). A penal statute need only give reasonable notice of the prohibited conduct to those who would avoid its penalties. *Ryan v. State, supra* at 90; *State v. Courtney, supra* at 709–11; *State v. Driscoll,* 53 Wis.2d 699, 701–2, 193 N.W.2d 851 (1972). *See also: Rose v. Locke,* 423 U.S. 48, 49–50 (1975) (Per Curiam); *Wainwright v. Stone,* 414 U.S. 21, 22 (1973) (Per Curiam).

Thus this court has emphasized that:

"Before a statute or rule may be invalidated for vagueness, there must appear some ambiguity or uncertainty in the gross outlines of the duty imposed or conduct prohibited such that one bent on obedience may not discern when the region of proscribed conduct is neared, or such that the trier of fact in ascertaining guilt or innocence is relegated to creating and applying its own standards of culpability rather than applying standards prescribed in the statute or rule." *State v. Courtney, supra* at 711.

The phrase conduct evincing a depraved mind regardless of human life is found not only in sec. 941.30, Stats., but also in sec. 940.02, Stats., the second-degree murder statute,[2] and sec. 940.23, Stats., prohibiting in-

---

[2] Sec. 940.02, Stats., states: "Whoever causes the death of another human being by conduct imminently dangerous to another

jury by conduct regardless of life.[3] These three crimes are identical in all elements except for the description of the resultant harm. *Martin v. State,* 57 Wis.2d 499, 504–5, 204 N.W.2d 499 (1973); *State v. Weso, supra* n. 1. As a result, the court has applied the construction of the phrases "conduct evincing a depraved mind, regardless of human life" and "conduct imminently dangerous to another" contained in cases brought under one of the statutes to cases brought under the other two. *Compare: State v. Dolan,* 44 Wis.2d 68, 170 N.W.2d 822 (1969), and *State v. Weso, supra* (applying cases construing the second-degree murder statute to a prosecution under sec. 941.30, Stats.) *with Wagner v. State,* 76 Wis.2d 30, 250 N.W.2d 331 (1977) (applying cases construing sec. 941.30 to a second-degree murder prosecution).

The phrase "evincing a depraved mind, regardless of human life" has been part of the statutory law of Wisconsin since 1849, when the second-degree murder statute was originally enacted. Ch. 133, sec. 2, Revised Statutes of 1849. (Sec. 941.30, Stats., was enacted in 1955. Ch. 696, sec. 1, Laws of 1955.) The phrase is also contained in the criminal statutes of other states. *See, e.g.,* Fla. Stat., sec. 782.04(2) (1977); *See also:* 40 Am. Jur.2d, *Homicide,* sec. 53 (1968); 1 *Wharton's Criminal Law and Procedure,* sec. 265 (1957). It has been construed by the courts of other jurisdictions as well as by this court. *See, e.g., Ramsey v. State,* 114 Fla. 766, 154 So. 855 (1934); *Stalder v. Stone,* 412 Ill. 488, 107 N.E.2d 696 (1952); *State v. Dolan supra; State v. Weso, supra; Wagner v. State, supra.*

---

and evincing a depraved mind, regardless of human life, may be imprisoned not less than 5 nor more than 25 years."

[3] Sec. 940.23, Stats., states: "Whoever causes great bodily harm to another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned not more than 10 years."

Despite the established role of the concept of depravity in the criminal law, the defendant nonetheless contends that its meaning in Wisconsin is unclear because this court's discussion of the phrase in *State v. Dolan, supra,* is ambiguous. In that case the court held that conduct evincing a depraved mind may be performed by a person with "the general intention to do harm." *Id.* at 72. At the same time in *Dolan* the court also approved of a model jury instruction stating that "It is not necessary that there be an intent to endanger the safety of another, but it is sufficient if the safety of another is endangered by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life." *Id.* at 74. The defendant contends that these two requirements, a "general intent to do harm" yet no "intent to endanger the safety of another," are inconsistent and render the meaning of depraved conduct vague. However, in *State v. Weso, supra,* the court clarified the nature of the intent necessary for a violation of sec. 941.30, Stats. There the court held that "A depraved mind has a general intent to do the acts and the consciousness of the nature of the acts and possible result but lacks the specific intent to do the harm." 60 Wis. at 412. The language of *Dolan* thus clarified is not ambiguous. *Dolan* and *Weso* both hold that, if a general intent exists to do acts which are likely to result in death, a specific intent to endanger the safety of the victim is unnecessary. In *Wagner v. State, supra,* we rejected the same contention made by the defendant here. The defendant in *Wagner* argued that *Dolan* seems to require "an intent to harm." We stated that:

"The statute does not require the existence of any particular state of mind in the actor at the time of the crime but only requires that there be conduct imminently dangerous to human life, which conduct evinces a de-

praved mind. *Jones, supra,* 49; *Ameen v. State,* 51 Wis. 2d 175, 185, 186 N.W.2d 206 (1971)." 76 Wis.2d at 48.

Thus there is no merit to the defendant's contention that this court's construction of the phrase "conduct evincing a depraved mind" is ambiguous or confusing.

The defendant also contends that the court may not usurp the legislature's power by continuing to supply standards for the phrase "conduct evincing a depraved mind" where the legislature has failed to do so. For the court to legislate standards, the defendant argues, would violate the constitutional principle of the separation of powers. The United States Supreme Court has consistently considered vagueness to be a due process problem rather than a separation of powers problem. At least one commentator has suggested the separation of powers concept as an alternative rationale. Collings, *Unconstitutional Uncertainty—An Appraisal,* 40 Corn. L. Rev. 195, 204 (1955). However, the author there concedes that even under this rationale "the presence of difficult borderline or peripheral cases will not invalidate a statute at least where there is a hard core of circumstances to which the statute unquestionably applies." 40 Corn. L. Rev. at 206; *see also, State v. Courtney, supra* at 711.

The legislature has supplied the standard for a violation of sec. 941.30, Stats., by requiring conduct evincing a depraved mind, regardless of human life. This phrase has a solid foundation in the English common law[4] as well as in American statutory and case law. It has been given an extensive construction by this court in *State v. Weso, supra,* and has been applied on a case-by-case basis many times. *See, e.g., Wagner v. State, supra;*

---

[4] *See:* 4 W. Blackstone's, *Commentaries,* \*198 (Lewis ed. 1897).

*Seidler v. State*, 64 Wis.2d 456, 219 N.W.2d 320 (1974);
*Turner v. State*, 76 Wis.2d 1, 250 N.W.2d 706 (1977);
*State v. Olson*, 75 Wis.2d 575, 250 N.W.2d 12 (1977);
*Bednarski v. State*, 53 Wis.2d 791, 193 N.W.2d 668
(1972); *State v. Dolan, supra*. In view of the many
Wisconsin cases discussing the phrase conduct evincing
a depraved mind, the defendant's contention that this
court should not "supply standards" for the phrase comes
too late.

For purposes of determining vagueness, a judicial con-
struction of a statute by the highest court of the state
becomes a part of that statute as definitely as if the
statute had been so amended by the legislature. *Winters
v. New York*, 333 U.S. 507, 514 (1948); *Wainwright v.
Stone, supra* at 22–23. That construction equates con-
duct evincing a depraved mind with conduct that is "in-
different to the life of others." *State v. Weso, supra* at
410. "A depraved mind is one having an inherent de-
ficiency of moral sense and rectitude. Otherwise it
would not prompt an act which in its nature is im-
minently dangerous to the safety of another." *Id.* at 410.
For conduct to evince a depraved mind more than negli-
gence or recklessness must exist. The conduct "must not
only disregard the safety of another but be devoid of
regard for the life of another." *Id.* at 411. To the extent
that the meaning of "depraved" in the criminal code
varies from its dictionary meaning [i.e., "marked by de-
basement, corruption, perversion, or deterioration," *Web-
ster's Third New International Dictionary*, 606 (1966)]
the term may be said to have attained a technical mean-
ing in the law. The existence of a technical meaning dif-
ferent from the ordinary meaning does not make the
phrase vague. *See*, sec. 990.01(1), Stats., which pro-
vides: "All words and phrases shall be construed accord-
ing to common and approved usage; but technical words

and phrases and others that have a peculiar meaning in
the law shall be construed according to such meaning."
Sec. 941.30, Stats., as originally enacted and as since
construed, shows no uncertainty or ambiguity in the
gross outlines of the conduct prohibited and therefore
is not unconstitutionally vague.

## II. *WAS THE EVIDENCE SUFFICIENT TO CON-VICT THE DEFENDANT OF VIOLATING SEC. 941.30, STATS.?*

Although we hold that sec. 941.30, Stats., is not void
for vagueness, we must nonetheless set aside the convic-
tion because the evidence was insufficient to prove guilt
beyond a reasonable doubt on all three elements of the
crime. In so holding, we are mindful that in reviewing
the jury's verdict we need only determine if the trier of
fact could, acting reasonably, be convinced by evidence
which it had a right to believe and accept as true.
*Turner v. State, supra* at 10; *Bautista v. State,* 53 Wis.2d
218, 223, 191 N.W.2d 725 (1971) ; *see also, Wagner v.
State, supra* at 36. The function of weighing the credi-
bility of the evidence is exclusively the jury's province,
and the verdict will be overturned only if it is inherently
or patently incredible or so lacking in probative value
that no jury could convict. *Fells v. State,* 65 Wis.2d 525,
529, 223 N.W.2d 507 (1974).

Although different witnesses brought out different
facts concerning the events giving rise to the charge of
endangering safety, there are no substantial conflicts in
the evidence. Officer Clifford Hudlett testified that at
approximately 3 :40 p.m. on the afternoon of October 23,
1974, he and another plainclothes policeman, Officer
Lange, were in an unmarked squad car at North Third
Street and West Everett Street in downtown Milwaukee
and were observing a 1974 Cutlass Supreme which they

believed to be stolen. Officer Hudlett observed the defendant enter and start the car, leave the curb, and stop at a stop sign at Third and Everett. Officer Hudlett brought the squad car up to the front end of the Cutlass and turned on the red light. Instead of getting out of the car, the defendant backed off slightly, swerved around the squad car, and attempted to elude the squad car. The defendant drove south on Third Street, east on St. Paul, south (going the wrong way) on Broadway, west on Buffalo, north through an alley, and east again on St. Paul. At that point Officers Hudlett and Lange lost the defendant. During the pursuit the siren and the red light on the side of the car were operating. Officer Hudlett testified that the traffic was "intense" and that the defendant was traveling at a speed of from 50 to 55 miles per hour and at one point greater than 60 miles per hour.

Officer Richard Lange's testimony confirmed that of Officer Hudlett. Officer Lange testified that the defendant was traveling approximately 60 miles per hour through "heavy" traffic and that "there were a lot of pedestrians."

Officer Frederick Leffler testified that he was driving another unmarked police car in downtown Milwaukee that afternoon. Upon receiving a radio broadcast for assistance from Officers Hudlett and Lange, he joined the chase at Broadway and Michigan. At that time he activated his siren and red light. He observed the defendant travel the wrong way down Broadway and veer "to avoid hitting us," forcing three women pedestrians in a crosswalk to jump back onto the curb and one of them to fall down. Officer Leffler estimated the defendant's speed at the time of this incident to be 35 miles per hour. The Leffler car then made a U-turn and pursued the defendant, trying to cut him off on Wells Street, but missed him. Another officer in the Leffler car then shot buckshot at the defendant's left rear tire.

According to Officer Leffler, the defendant then proceeded through the alley, east on Mason Street through a red light at Mason and Water, south on Water to Clybourn, east on St. Paul, south through an alley, east on Buffalo, south on Milwaukee onto Young Street, through two red lights, west onto Pittsburgh Street, and then south on South Second Street. He went through several red lights on Second Street until colliding with Mr. Timmermann's car at Second Street and Greenfield Avenue. Officer Leffler testified that during this portion of the pursuit the defendant traveled at approximately 45 miles per hour until he got to South Second Street where he began to go in excess of 60 miles per hour. Officer Leffler also observed that the defendant's brake lights went on and off "all through the chase." He estimated pedestrian and vehicular traffic as "very heavy" until South Second Street where traffic was "fair to light." He could not state whether the defendant had his headlights on because he was pursuing him from behind.

Fred Timmermann testified that just prior to the collision he was travelling north on Second Street and had stopped at a light at Second and Greenfield. The light turned green, and he had just cleared the intersection when he saw the defendant coming at him, straddling the center line. He was able to stop before the collision, but had no place to go to avoid a collision. He testified that the defendant's horn was blowing, and the defendant had been applying his brakes and trying to stop. Mr. Timmermann estimated that the defendant's speed at the time of the collision was 5 to 10 miles per hour. Mr. Timmermann scratched his finger slightly and bumped his head, but sustained no other personal injuries. He sustained approximately $527 in damage to his car.

The defendant testified in his own behalf. He testified that, when he first drove away on Everett Street, he was facing west into the late afternoon sun and did not im-

mediately see the red light on the car that tried to cut him off. He eventually saw the light and heard the siren, but he "panicked," thinking the police were after his car. He admitted he had no driver's license, traveled the wrong way on Broadway, but he testified he was "paying pretty close attention." He testified that at Broadway and Michigan the squad car veered toward him, and he veered to avoid it. The defendant stated that he did not go through any red lights until the shotgun blast. Thereafter, he testified, he turned on his headlights and accelerated. He stated that he did not accelerate beyond 40 miles per hour until after the shotgun blast and that, as he approached the intersection of Second and Greenfield, he was "laying on" the horn. He knew the police were chasing him. He admitted that he was trying to escape and that he should have stopped.

In order to support the conviction of the defendant under sec. 941.30, Stats., the State must prove beyond a reasonable doubt the following essential elements: (1) that the defendant's conduct did endanger the safety of another; (2) that the conduct was imminently dangerous to another; and (3) that the conduct was of such character that it evinced a depraved mind, regardless of human life; *Bednarski v. State, supra* at 793; *State v. Dolan, supra* at 73. The qualities of the act as imminently dangerous and evincing a depraved mind, regardless of human life are to be found in the act itself and the circumstances of its commission. *State v. Weso, supra* at 409, *quoting: Hogan v. State,* 36 Wis. 226 (1874) and *Montgomery v. State,* 178 Wis. 461, 190 N.W. 105 (1922).

(1) *Endangering the Safety of Another*

The first element of the crime is that the victim's safety is actually endangered by the defendant's conduct. Actual injury is not an essential element of the crime.

*State v. Olson, supra* at 592. It is clear that sufficient evidence exists that the defendant's conduct actually endangered the safety of Mr. Timmermann.

(2) *Conduct Imminently Dangerous to Another*

The second element of the crime is that the defendant's conduct must be imminently dangerous to another. Imminently dangerous conduct is dangerous in and of itself. It must have been conduct inherently, apparently, and consciously dangerous to life and not such as might casually produce death by misadventure. *Turner v. State, supra* at 11–13; *State v. Olson, supra* at 592; *Seidler v. State, supra* at 462; *see also,* Wis J I—*Criminal,* 1345. The conduct as well as the instrumentality used must have the potentiality of causing death, though death may not be intended. *State v. Dolan, supra* at 72.

Speeding in an automobile where there is pedestrian or vehicular traffic can be conduct imminently dangerous to life. In *Montgomery v. State, supra,* the defendant turned into a lane of travel where pedestrians were boarding a streetcar. The defendant's passenger warned the defendant of the presence of the pedestrians, but the defendant took no measures to avoid hitting them. The court affirmed the defendant's conviction under sec. 940.02, Stats. Similarly, in *Bednarski v. State, supra,* the court affirmed a conviction for violation of sec. 941.30, Stats., where the defendant deliberately ran into a policeman on a motorcycle as the policeman attempted to stop him for speeding.

However, speeding does not constitute conduct imminently dangerous to life if the manner in which it is done does not evidence a conscious disregard for life. *Wagner v. State, supra.* In *Wagner* we reversed a conviction of second-degree murder on the grounds that the defendant's conduct was not imminently dangerous to

life. There the defendant, who was drag racing while intoxicated down the main street of Marshfield, Wisconsin, at approximately 11 p.m. on a Friday night, killed a pedestrian. But the defendant was not forewarned of the victim's presence in the road prior to striking him; and upon first seeing the victim, the accused swerved to avoid striking him. For those reasons we held that the element of imminently dangerous conduct, inherently dangerous to life, was not proved.

We do not find *Wagner* controlling with respect to the element of imminently dangerous conduct. In *Wagner* there is no evidence that the Marshfield street was crowded with vehicles or pedestrians. However, in this case the pursuit occurred in downtown Milwaukee rush-hour, weekday traffic. These circumstances alone gave notice to the defendant ·that attempting to elude the police at that time was likely to endanger the safety of others. In addition, in *Wagner* the defendant was not forewarned that the victim or anyone else was likely to be in his way. Here the defendant had already barely missed hitting three pedestrians and many vehicles.

The defendant contends that the trial court should have stricken the testimony of Officers Hudlett and Lange concerning the first half of the pursuit, which included the testimony about the three pedestrians who had to jump back onto the curb. The defendant contends this evidence was too remote to be relevant to the issue of endangering the safety of Fred Timmermann. The defendant argues that this evidence made it likely that the jury convicted him of endangering the safety of the three pedestrians, a crime that was not charged.

In *Hart v. State*, 75 Wis.2d 371, 386, 249 N.W.2d 810 (1977), we held that, when a charge arises out of the defendant's use of a motor vehicle, evidence of his reckless or unlawful driving prior to the scene of the accident

is admissible if the court concludes it was probable that the same manner of driving continued until the accident occurred. In this case it is reasonable to conclude that the defendant's reckless driving during the first part of the pursuit would continue for the duration of the pursuit. The defendant was observed continuously up until the accident by one or another of the police officers who testified at the trial. Their testimony showed that the same manner of driving continued until the collision occurred. Thus the trial court did not err in admitting evidence of the defendant's driving conduct during the first half of the pursuit. The defendant conceded that as he drove down Second Street his speed reached 60 miles per hour. At the moment of the collision, he had veered into the oncoming lane of traffic. The defendant's conduct was imminently dangerous to life throughout the entire incident. By the time the defendant hit the Timmermann vehicle, he had ample notice that, despite the use of his headlights, horn, and brakes, driving at speeds of up to 60 miles per hour in downtown rush-hour traffic was inherently and consciously dangerous to life and not such as might produce death by misadventure. On the contrary, only chance saved those present along the route, including Mr. Timmermann, from serious injury or death.

(3) *Conduct Evincing a Depraved Mind*

The final element of endangering the safety of another contrary to sec. 941.30, Stats., is that the defendant's conduct must evince a depraved mind regardless of human life. The evidence was undisputed that the defendant turned on his headlights, swerved to avoid the squad car, honked his horn, and braked to avoid the collision. These actions show some regard for the life of others. Conduct evincing a depraved mind must do more than create a situation of unreasonable risk of harm or death;

it must be devoid of regard for the life of another. *State v. Weso, supra* at 411; *Seidler v. State, supra* at 464; *Wagner v. State, supra* at 46. The State offered no evidence that, when the three pedestrians were forced to jump back on the sidewalk, the defendant saw them or was willing to hit them. Though we conclude that the defendant's conduct was imminently dangerous to another, we cannot conclude that it was devoid of regard for the life of others, including Fred Timmermann. In *Wagner* the court said, "At the very least, [the] attempt to avoid striking the victim by swerving to the left indicates some regard for the life of the victim." 76 Wis.2d at 47. Conduct involving the operation of a motor vehicle that evinces depravity must be more than the negligent or reckless operation of a motor vehicle, though as the court stated in *Weso*, recklessness can be an element. 60 Wis.2d at 410. Although the conduct may in fact result in nothing more than the danger of bodily injury, it must be so inherently fraught with danger to the victim's life that to engage in it implies a constructive intent to maim or kill. The uncontroverted evidence that the defendant attempted to avoid a collision precludes a finding that his conduct was devoid of concern for others or indifferent to the life of others. Though the evidence clearly suggests that the defendant's conduct violated any one of several statutory prohibitions, the State failed to prove beyond a reasonable doubt the depraved mind element of the particular crime charged, and the conviction must be set aside.

*By the Court.*—Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.