STATE of Wisconsin, Plaintiff-Respondent,

v.

Anrietta M. GESKE, Defendant-Appellant†.

Court of Appeals

*No. 2010AP2808–CR.—Submitted on briefs November 22, 2011.
—Decided January 4, 2012.*

2012 WI App 15

(Also reported in 810 N.W.2d 226.)

† Petition for Review denied 5/14/12.

170

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jefren E. Olsen*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Maura FJ Whelan*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Hoover, P.J., Peterson, J., and Thomas Cane, Reserve Judge.

¶ 1. HOOVER, P.J.   Anrietta Geske appeals a judgment of conviction for recklessly endangering safety and two counts of first-degree reckless homicide, and an order denying her motion for postconviction relief. Geske argues there was insufficient evidence supporting the utter disregard for human life element of the homicide charges. She further argues that computer-

simulated accident reconstruction evidence was erroneously admitted for multiple reasons, and that the circuit court erroneously exercised its sentencing discretion. We reject Geske's arguments and affirm.

## BACKGROUND

¶ 2. Geske consumed prescription medication, had drinks at a bar, and then drove her Porsche into the side of a rusty Buick at a high speed, killing the Buick's two occupants. Moments earlier, sixteen-year-old Tyler Hampton was operating his vehicle on South Oneida Street in Green Bay, a well-traveled commercial strip. Hampton was in the left lane, stopped at a red light at Cormier Road. He noticed a Porsche convertible in the right lane. When the light turned green, Hampton "[took] off . . . kind of fast," leaving the Porsche behind.

¶ 3. The speed limit was thirty miles per hour. Hampton was driving between forty and forty-five miles per hour when, in the middle of the next block, he started to slow down for a red light at Willard Drive. Then, he "heard the Porsche's engine get really loud. So I had figured she downshifted, and I saw her basically just zoom past me." Hampton estimated the Porsche was going "[a]round 80, 85 miles an hour." It went through the red light at Willard, and Hampton "didn't see any brake lights go on." Hampton saw a dark-colored sedan drive from Willard onto Oneida. The Porsche swerved left, but struck the sedan.

¶ 4. Fifteen-year-old Elizabeth Sadowsky was a passenger in Hampton's car. She also recalled encountering the Porsche at the Cormier Road intersection. In the middle of the next block, Sadowsky saw

> her coming out of the corner of my eye and just like flying past us really fast like I have never really seen a car go that fast on that road or any road in general past me, and . . . I was like holy cow, and then Tyler noticed

that the light in front of us was red, and he was like, "Liz, that's a red light," and I was like she's not stopping at all . . . .

Sadowsky could see the driver as the Porsche passed by. "[S]he was very like set back in her car, and her hair was just like flying all over because . . . the top was down . . . ." Sadowsky thought the Porsche was going at least eighty miles per hour. She could not remember whether the driver braked, but she did see the swerve.

¶ 5.   Geske's blood alcohol content was .072 about two hours after the crash. Additionally, she had consumed prescription medication carrying recommendations against also consuming alcohol. Geske testified that as she reached for her small dog, which had become loose in the vehicle, she took her attention from the road and inadvertently accelerated and ran the red light.

¶ 6.   Police officer Thomas Kraus explained that the Porsche "was protruded so far into [the Buick], that it caused the back tires to come up . . . . It was—in my 20 years' experience . . . the most damage done to a vehicle that I've ever seen." Lieutenant Scott Schermitzler testified, "The wreckage . . . was devastating" and "significantly more severe than normal." Other public safety professionals similarly testified that the wreckage was the worst they had seen in their decades of experience.

¶ 7.   The State presented two experts who analyzed the crash scene and reconstructed the crash. Deputy Kevin Pawlak explained that after colliding, the joined cars traveled 127 feet. He opined that distance was inconsistent with a fifty or sixty mile per hour crash. Rather, he concluded the Porsche was traveling between seventy-nine and ninety-six miles per hour at the time of impact, with the most probable speed being around eighty-seven miles per hour. State patrol sergeant Duane Meyers estimated that Geske was traveling eighty to

eighty-six miles per hour at the time of impact. He believed the "extensive damage" was inconsistent with the Porsche traveling at fifty or sixty miles per hour.

¶ 8. Geske presented one expert, engineer John DeRosia. DeRosia prepared an accident reconstruction and concluded Geske was going between fifty-two and fifty-seven miles per hour. DeRosia also explained why he felt the State's experts were mistaken. He stressed that the rusty condition of the Buick significantly compromised its structural integrity and that the extensive damage was therefore consistent with a lower speed crash. He also disagreed with Pawlak's drag factor or "friction rates" for the vehicles as they moved after the collision.

¶ 9. The jury was instructed on the lesser included offenses of second-degree reckless homicide and negligent homicide. It found Geske guilty of two counts of first-degree reckless homicide and of recklessly endangering safety.[1] Following the denial of her postconviction motion, Geske appeals.

## DISCUSSION

*Sufficiency of the evidence*

¶ 10. Geske argues the State failed to prove the first-degree reckless homicide element that she acted with utter disregard for human life. When reviewing the sufficiency of the evidence, we may not substitute our

---

[1] The jury also found Geske guilty of two counts of homicide by intoxicated use of a vehicle, and not guilty of homicide by operation of a vehicle with a prohibited blood alcohol content. At sentencing, the court dismissed the two additional homicide counts as multiplicitous under WIS. STAT. § 939.66(2).

All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

177

judgment for that of the jury unless the evidence, viewed most favorably to the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). However, the determination of whether the evidence satisfies the legal elements of the charge constitutes a question of law that we review independently. *State v. Wulff*, 207 Wis. 2d 143, 151–54, 557 N.W.2d 813 (1997).

■

¶ 11. Relevant factors to consider in determining whether conduct showed utter disregard for human life include: what the defendant was doing; why the defendant was engaged in that conduct; how dangerous the conduct was; how obvious the danger was; and whether the conduct showed any regard for life. *State v. Jensen*, 2000 WI 84, ¶ 24, 236 Wis. 2d 521, 613 N.W.2d 170; Wis JI—Criminal 1020 (Apr. 2002). Ultimately, we " 'consider the totality of the circumstances when determining whether the defendant showed some regard for life.' " *State v. Burris*, 2011 WI 32, ¶¶ 36, 41, 333 Wis. 2d 87, 797 N.W.2d 430 (quoting *State v. Miller*, 2009 WI App 111, ¶ 35 n.12, 320 Wis. 2d 724, 772 N.W.2d 188). The utter disregard standard has been explained as follows:

> Utter disregard requires more than a high degree of negligence or recklessness. To evince utter disregard, the mind must not only disregard the safety of another but be devoid of regard for the life of another. A depraved mind lacks a moral sense, an appreciation of life, is unreasonable and lacks judgment. A person acting with utter disregard must possess a state of mind which has no regard for the moral or social duties of a human being.

*Miller*, 320 Wis. 2d 724, ¶ 33 (punctuation omitted)

(citing *Wagner v. State*, 76 Wis. 2d 30, 45–46, 250 N.W.2d 331 (1977)).

¶ 12.  Geske argues that because she swerved to avoid the collision, the State could not prove utter disregard for human life. She relies on two prior cases where our supreme court held that swerving one's vehicle to avoid a collision precluded a finding of utter disregard. *See Balistreri v. State*, 83 Wis. 2d 440, 458, 265 N.W.2d 290 (1978); *Wagner*, 76 Wis. 2d at 47.

¶ 13.  In *Wagner*, the defendant was taking pain and sleeping pills following a surgery. *Wagner*, 76 Wis. 2d at 31. Wagner went out drinking at several bars in Marshfield, leaving around 11:00 p.m. *Id.* at 32. However, he blacked out and did not recall anything after the first bar. *Id.* Wagner's car was stopped in the right lane at a traffic light when another vehicle stopped in the left lane. *Id.* at 32–33. Wagner then engaged in a "drag race" with the other car on the main city street. *Id.* at 31, 33. He struck and killed a pedestrian who had exited a bar and was crossing the street to his parked car. *Id.* at 31–32, 35.

¶ 14.  The two eyewitnesses to the incident testified they saw the racing cars "suddenly swerve to the left approximately one-half of a traffic lane" immediately before striking the victim. *Id.* at 33. Wagner continued driving, even though his windshield had shattered. *Id.* at 33, 35. Wagner was later found at a home unconscious; his blood alcohol content was .178 about two hours after the incident. *Id.* at 35. The front right portion of his car was extensively damaged. *Id.* Wagner's speed was never established; however, a witness estimated the vehicle was traveling about fifty miles per hour as it passed by him a few blocks away from the incident on another street. *Id.* at 34, 39–40. The supreme court vacated Wagner's conviction because "his attempt

179

to avoid striking the victim by swerving to the left indicates some regard for the life of the victim." *Id.* at 47.

¶ 15.  *Balistreri* involved a police chase through downtown Milwaukee during rush hour, weekday traffic. *Balistreri,* 83 Wis. 2d at 444–45. Balistreri, who was being pursued by a police car, drove the wrong way down at least two one-way streets. *Id.* at 452. He swerved to avoid an oncoming police vehicle, thereby forcing three pedestrians in a crosswalk to jump to the curb for safety. *Id.* During the course of the chase, Balistreri was sometimes going over fifty miles per hour, at one point even exceeding sixty miles per hour. *Id.* He also proceeded through at least five red lights. *Id.* at 453. Although traffic was at times intense, during the last stretch of the chase, it was fair to light. *Id.* at 452–53. The chase ended when Balistreri struck an automobile at an intersection. *Id.* at 444, 453.

¶ 16.  The supreme court reversed Balistreri's conviction. The court noted the undisputed evidence that the defendant turned on his car's headlights, swerved to avoid the squad car on one of the one-way streets, and sounded his horn and braked in an attempt to avoid the collision with the other vehicle. *Id.* at 457. The court concluded the evidence was insufficient because "[t]hese actions show some regard for the life of others." *Id.* Following *Wagner,* the court held that "[t]he uncontroverted evidence that the defendant attempted to avoid a collision precludes a finding that his conduct was devoid of concern for others or indifferent to the life of others." *Id.* at 458.

¶ 17.  While swerving was held to show regard for life in prior cases, we must consider the defendant's conduct in context, that is, in light of the totality of the circumstances. Our supreme court recently reiterated this principle in *Burris:*  "[W]e have 'carefully avoided

*per se* rules in this area and instead [have] consistently applied a totality of the circumstances approach to the cases.' We continue along that path today." *Burris*, 333 Wis. 2d 87, ¶ 38 n.9 (quoting *Miller,* 320 Wis. 2d 724, ¶ 37).

█

¶ 18.   We agree with Geske that her case is similar in many respects to *Wagner*, in particular, as well as *Balistreri.* It is not, however, the same. Geske was driving over eighty miles per hour on a major, well-traveled city street after consuming alcohol and prescription pills. She never braked or slowed down before running the red light, even though her view to the right—where the victims' car came from—was obscured by a large sign. These factors demonstrate an utter disregard for human life, regardless of whether Geske attempted a last-moment swerve.[2] A legally intoxicated person[3] driving over eighty miles per hour through the city could not reasonably expect to avoid any collision by swerving at the last moment.[4] Given the totality of the situation here, Geske's ineffectual swerve failed to demonstrate a regard for human life.

---

[2] This holding is consistent with prior cases where a particular act suggesting a regard for another's life was deemed too insignificant under the totality of the circumstances to preclude a finding that the defendant's conduct showed utter disregard for human life. *See State v. Burris*, 2011 WI 32, ¶¶ 34, 54, 333 Wis. 2d 87, 797 N.W.2d 430 (discussing *State v. Jensen*, 2000 WI 84, 236 Wis. 2d 521, 613 N.W.2d 170).

[3] As noted previously, the jury found Geske guilty of homicide by intoxicated use of a vehicle.

[4] Indeed, it appears possible that the swerve here could have increased the harm. Geske was traveling in the right lane of the road before she swerved. Yet, the collision occurred in the left lane. Geske "impaled" the center of the victims' car, which had been moving to Geske's left. Had she instead stayed in her

¶ 19. This case is distinguishable from *Wagner* because Geske had ample notice that her victims might cross her path: a red light at an intersection. In *Wagner*, the victim had unexpectedly appeared in Wagner's path. *Wagner*, 76 Wis. 2d at 43. The court distinguished that circumstance from a prior case where a driver "knew or should have known of [the victims'] presence." *Id.* (citing *Montgomery v. State*, 178 Wis. 461, 190 N.W. 105 (1922)). The court explained:

> In the instant case, neither the defendant, nor the occupants of his vehicle, saw the victim in the road prior to striking him. In fact, the evidence is unclear as to whether the victim was standing in the road while the vehicle bore down on him, or whether the victim suddenly stepped in front of the vehicle. In any event, there was no testimony that the defendant was forewarned of the victim's presence in the street.

*Id.* at 43–44. Additionally, the witness who was blocks away from the drag race testified he "heard the squealing of tires and loud roar of mufflers on" the street where the drag race occurred. *Id.* at 33–34. Thus, Wagner could have reasonably expected that others would be aware of the drag-racing cars' approach that July night, thereby reducing the potential that somebody would enter the racing vehicles' path. Geske, on the other hand, should have reasonably expected her victims to cross her path—they had a green light and their view in Geske's direction was obscured.[5]

---

lane or swerved slightly to the right, perhaps the collision would have been less severe or even avoided.

[5] The State argues *Wagner* should be distinguished because swerving to avoid a pedestrian shows regard for others, while swerving to avoid another vehicle is merely a selfish act to protect oneself. *See Wagner v. State*, 76 Wis. 2d 30, 250 N.W.2d

¶ 20. *Wagner* is further distinguishable because of the extreme speed involved in this case. There was no evidence in *Wagner* that the defendant was driving nearly as fast as Geske was. As speeds increase, the probability of avoiding a collision by swerving, of course, decreases.

¶ 21. *Balistreri*, which is less similar factually to the present case, is also distinguishable. There, Balistreri's reckless driving was more extensive in time and distance. Thus, during the course of his conduct, he took numerous actions to avoid collisions. Significantly, according to the pursuing officer, Balistreri's "brake lights went on and off 'all through the chase.' " *Balistreri*, 83 Wis. 2d at 453. Additionally, while Balistreri did reach excessive speeds, he never drove as fast as Geske did here. Nor was Balistreri intoxicated. In fact, Balistreri's lower speeds, sobriety, and evasive maneuvers combined to avoid the catastrophic type of collision that occurred here. Balistreri honked and braked before his collision, resulting in a five to ten mile-per-hour collision. *Id.* The victim "scratched his finger slightly and bumped his head, but sustained no other personal injuries." *Id.*

*Accident reconstruction computer simulation*

¶ 22. Geske next argues the circuit court erroneously allowed the State to introduce an "EDSMAC" computer simulation because (1) it was not disclosed as

331 (1977). This notion, however, is inconsistent with *Balistreri*, where the avoidance maneuvers were all taken relative to other vehicles. *See Balistreri v. State*, 83 Wis. 2d 440, 458, 265 N.W.2d 290 (1978). Additionally, as evidenced by the substantial damage to Wagner's vehicle, a collision with a pedestrian at high speed also poses a significant potential of injury to the driver. *See Wagner*, 76 Wis. 2d at 33, 35.

required by Wis. Stat. § 971.23, and (2) it lacked foundation and probative value. The simulation at issue was prepared during the course of trial by Meyers, the State's expert, utilizing data from the expected testimony of DeRosia, Geske's expert. The State introduced the simulation in rebuttal, after DeRosia testified that a computer simulation should have been run, and that he probably would have used the EDSMAC program. If accepted by the jury, the EDSMAC simulation undermined DeRosia's speed estimate.

¶ 23. A district attorney is required to disclose and make available for inspection:

> (d) A list of all witnesses and their addresses whom the district attorney intends to call at the trial. This paragraph does not apply to rebuttal witnesses or those called for impeachment only.

> (e) Any relevant written or recorded statements of a witness named on a list under par. (d), including any audiovisual recording of an oral statement of a child . . ., any reports or statements of experts made in connection with the case or, if an expert does not prepare a report or statement, a written summary of the expert's findings or the subject matter of his or her testimony, and the results of any physical or mental examination, scientific test, experiment or comparison that the district attorney intends to offer in evidence at trial.

Wisconsin Stat. § 971.23(1)(d), (1)(e). Geske argues that because Meyers was listed as a witness under para. (1)(d), the State was obligated under para. (1)(e) to disclose the results of the computer simulation without exception.

¶ 24. We disagree. Wisconsin Stat. § 971.23(1)(e) is comprised of two distinct components. While para.

184

(1)(e) requires disclosure of all "relevant" statements of a named witness, including summaries of expert testimony, it only requires the disclosure of medical examinations, scientific tests, or experiments if the State "intends to offer" that evidence. In other words, even if otherwise "relevant," the district attorney need not disclose scientific test or experiment results if he or she does not intend to use them. Interpreting the statute as Geske suggests would render surplusage the language "that the district attorney intends to offer in evidence at trial." Thus, it is irrelevant whether the person who conducted the experiment is named as a witness. The case that Geske relies on did not involve evidence subject to para. (1)(e)'s intent-to-offer provision. *See State v. Gribble*, 2001 WI App 227, 248 Wis. 2d 409, 636 N.W.2d 488.

¶ 25. Geske next argues that, regardless, the phrase "intends to offer in evidence at trial" refers to the entire trial, i.e., not just the State's case-in-chief, but to rebuttal evidence as well. Further, she contends the prosecutor's intent must be measured objectively, citing *State v. Harris*, 2008 WI 15, ¶ 75 n.37, 307 Wis. 2d 555, 745 N.W.2d 397, and *State v. DeLao*, 2002 WI 49, ¶¶ 30, 33, 252 Wis. 2d 289, 643 N.W.2d 480. We agree with the State, however, that this case is controlled by *State v. Moriarty*, 107 Wis. 2d 622, 321 N.W.2d 324 (Ct. App. 1982) (superseded, in part, by statute).[6] The various

---

[6] In *Moriarty*, we held that medical records were not subject to mandatory disclosure because they "were not 'reports or results of any scientific tests or experiments made by any party relating to evidence intended to be introduced at the trial.'" *State v. Moriarty*, 107 Wis. 2d 622, 627, 321 N.W.2d 324 (Ct. App. 1982) (quoting Wis. Stat. § 971.23(5) (1981–82)). This conclusion was based in part on the lack of any scientific tests or experiments within the medical records. *Id.* at 628. The

185

cases Geske relies upon did not involve Wɪs. Sᴛᴀᴛ. § 971.23(1)(e)'s provision concerning intent to offer scientific experiments.

¶ 26. *Moriarty* dealt with a provision of a prior version of the discovery statute that is substantially equivalent to the one at issue here. There, the statute provided for disclosure of "reports or results of any scientific tests or experiments made by any party relating to evidence intended to be introduced at the trial." Wɪs. Sᴛᴀᴛ. § 971.23(5) (1981–82); *Moriarty*, 107 Wis. 2d at 626–27. The facts in *Moriarty* were as follows:

> The district attorney . . . stated that he did not intend to use the medical records in the presentation of his case-in-chief. The transcript shows that [the victim's] injuries were not at issue during the prosecution's presentation of its case or during cross-examination of [the victim] by the defense. The injuries only became an issue during the defense portion of the trial, when [the] defendant . . . testified and implied that [the] injuries were caused by a sudden stop of the vehicle. The trial court found that the evidence was being offered to rebut [that] testimony about the cause of [the victim's] injuries.

*Moriarty*, 107 Wis. 2d at 627. We held that the evidence was not subject to the statute's disclosure requirement because:

> First of all, the prosecution did not intend to use medical evidence of [the victim's] injuries at trial. As the trial court found, the question of the source of [the] injuries was raised for the first time by the defense, and the records were offered only to impeach [the defendant's] testimony in that regard.

*Id.* at 627–28.

---

current discovery statute, however, now requires disclosure of "the results of any physical or mental examination," in addition to scientific tests or experiments. *See* Wɪs. Sᴛᴀᴛ. § 971.23(1)(e).

¶ 27. Here, the prosecutor represented during trial and postconviction proceedings that the State did not intend to offer the simulation in evidence at trial until DeRosia referred to EDSMAC during cross-examination. The circuit court apparently accepted the State's representation. Therefore, in accordance with *Moriarty*, the State was not required to disclose the EDSMAC simulation prior to DeRosia's testimony.

¶ 28. Moreover, even if we were to apply an objective standard, that is, whether a reasonable prosecutor would have intended to use the simulation at trial, Geske's argument still fails. The simulation could not be used to confirm the State's experts' testimony, because their conclusions required numerical inputs that the simulation program could not accept. Thus, the EDSMAC program was irrelevant to the State's case. It only became relevant when DeRosia testified that an EDSMAC simulation should have been run, and testified regarding what data inputs should have been used. The State then rebutted DeRosia's testimony by introducing such a simulation. That simulation, however, could not validate the State's experts' conclusions. No reasonable prosecutor would have intended to offer irrelevant evidence.

¶ 29. Geske next argues that, nonetheless, the State violated the Wis. Stat. § 971.23(7) continuing duty to disclose, because the State did not immediately disclose its EDSMAC simulation at the time DeRosia testified about the subject, or at least when cross-examination was finished. Subsection 971.23(7) provides that if a party "discovers additional material . . . subject to discovery, . . . the party shall promptly notify the other party of the existence of the additional material[.]"

¶ 30. Geske stresses that the State waited approximately four hours after DeRosia referred to EDS-MAC, including lunch and other breaks. We disagree that four hours is an unreasonable delay in disclosure by the State after learning that it might wish to introduce its EDSMAC simulation. This is especially true given that the disclosure was made only two and one-half hours after the State completed its cross-examination of DeRosia.

¶ 31. Geske next argues the EDSMAC simulation was erroneously introduced because it lacked a foundation and probative value. Specifically, Geske takes issue with the stiffness factor Meyers entered into the program. Meyers inputted forty-five pounds per square inch for the Buick, whereas a new Buick would have a factor of about ninety-five. Meyers acknowledged the stiffness factor was an estimate, and that the true number could not be determined. However, he opined that it would be "unreasonable" to use an even lower number. Additionally, his number was consistent with DeRosia's testimony that "much less rusty vehicles" are "half as stiff or less than comparable new vehicles."

¶ 32. We reject Geske's argument that the EDS-MAC simulation lacked foundation and probative value. The simulation did not need to precisely reflect all the conditions of the crash to be admissible. Rather, Meyers only needed to enter data that was "sufficiently similar to [the actual conditions] to give the jury a view of what occur[red]." *See Maskrey v. Volkswagenwerk Aktiengesellschaft*, 125 Wis. 2d 145, 166, 370 N.W.2d 815 (Ct. App. 1985). Any faults in the variables entered into Meyers' simulation were adequately presented to the jury on cross-examination. *See id.* at 165. Further,

188

the simulation was not introduced to precisely re-create the accident. Rather, it was introduced to demonstrate that DeRosia's recommended validation tool failed to validate his conclusions. The fact that the simulation could not demonstrate whether the Porsche was going eighty-five miles per hour has no bearing on its ability to demonstrate that the Porsche was not going fifty-five miles per hour.

¶ 33.  Finally, we conclude that even if the court erred by allowing the EDSMAC simulation, it was harmless error. As to delay in disclosing the simulation, Geske thoroughly pursued her current criticisms of the simulation during cross-examination. Also, a postconviction letter from DeRosia indicating that EDSMAC was not useful in this case merely confirms Meyers' opinion that DeRosia's own recommended validation tool was inapplicable because the crash was too severe.[7] Regardless, as set forth in the State's brief and the circuit court's analysis, the evidence supporting the verdicts against Geske was so strong that there is no reasonable doubt that the verdicts would have been the same with or without the rebuttal evidence.

*Exercise of sentencing discretion*

¶ 34.  Lastly, Geske argues the circuit court erroneously exercised its sentencing discretion by placing excessive weight on her demeanor and candor at trial, as compared to her otherwise clean criminal record over forty-six years. The court sentenced Geske to the maxi-

---

[7] Specifically, the program could not reconstruct the actual crash because the Porsche impaled the Buick with sufficient force to intrude beyond the Buick's center of gravity.

189

mum on the two homicide charges, totaling eighty years' confinement and forty years' extended supervision.[8]

¶ 35. The primary factors to be considered at sentencing are the gravity of the offense, the character of the offender, and the need to protect the public. *State v. Santana*, 220 Wis. 2d 674, 680, 584 N.W.2d 151 (Ct. App. 1998). The weight given to each factor is a matter of trial court discretion. *Id.* The court may consider the defendant's lack of remorse. *See State v. Baldwin*, 101 Wis. 2d 441, 456–59, 304 N.W.2d 742 (1981). "[I]t is impermissible for a trial judge to add to a convicted defendant's sentence an additional term for the crime of perjury. If perjury has occurred, it should be the subject of a separate charge and conviction." *Lange v. State*, 54 Wis. 2d 569, 575, 196 N.W.2d 680 (1972). "We have, however, frequently pointed out that the trial judge's appraisal of a defendant's attitude, including the evidence of his [or her] veracity at trial is highly relevant to the exercise of sentencing discretion." *Id.* We give deference to the sentencing court because it is in a "superior position to observe the demeanor of the defendant, weigh the evidence available and consider the relevant factors." *State v. Bizzle*, 222 Wis. 2d 100, 105, 107, 585 N.W.2d 899 (Ct. App. 1998).

¶ 36. The court here properly considered the three primary sentencing factors. We have reviewed the court's sentencing comments and observe no error in discretion. The court acknowledged it was aware of

---

[8] On the reckless endangerment count, the court sentenced Geske to a total of twelve and one-half years, to be served concurrently with the homicide sentences.

190

Geske's bipolar disorder and that it may have had an effect on the court's perception of Geske's demeanor. The court was therefore entitled to place the weight on Geske's demeanor it saw fit. As to Geske's truthfulness, the court could properly consider that factor as it related to Geske's remorse. The court considered Geske's "perjured," "ridiculous," "selfish," "laughable," not "remotely believable," "manufacture[d]" testimony to be "direct proof of lack of remorse and repentance." It was not unreasonable to conclude Geske falsely testified that she inadvertently accelerated through the red light because she was reaching for her little dog.

*By the Court.*—Judgment and order affirmed.