# COURT OF APPEALS
# DECISION
# DATED AND FILED

## August 26, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP850-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF639

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

CASSANDRA M. STAAB,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Marathon County: JILL N. FALSTAD and MICHAEL K. MORAN, Judges. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Cassandra M. Staab appeals a judgment of conviction for first-degree reckless homicide by delivery of a controlled substance, first-degree recklessly endangering safety, felony bail jumping, and misdemeanor bail jumping. She also appeals an order denying her motion for postconviction relief.[1]

¶2 Staab raises six arguments on appeal. First, she asserts that her conviction for first-degree reckless homicide must be vacated because the applicable statute, WIS. STAT. § 940.02(2)(a) (2023-24),[2] "does not apply" to the facts of this case. Second, Staab asserts that the evidence at trial was insufficient to support her conviction for first-degree recklessly endangering safety because the State failed to prove that she acted with utter disregard for human life. Third, Staab contends that Marathon County was not a proper venue for the recklessly endangering safety charge. Fourth, Staab argues that she is entitled to a new trial based on newly discovered evidence. Fifth, Staab seeks a new trial based on ineffective assistance of trial counsel. Sixth, Staab asks us to grant her a new trial in the interest of justice.

¶3 For the reasons that follow, we reject each of Staab's arguments. We therefore affirm the judgment of conviction and the order denying postconviction relief.

---

[1] The Honorable Jill N. Falstad presided over Staab's trial and entered her judgment of conviction. The Honorable Michael K. Moran entered the order denying postconviction relief.

[2] The offenses at issue in this case took place in January 2017. However, the relevant statutes have not changed since that time. Accordingly, for convenience, all references to the Wisconsin Statutes are to the 2023-24 version.

## BACKGROUND

¶4    The charges in this case arose from allegations that Staab delivered heroin to Ben; that Ben subsequently overdosed after using some of the heroin; and that Ben's roommate at his parents' house, Allen, later suffered a fatal overdose after using some of the same heroin that Ben had received from Staab.[3] Staab entered pleas of not guilty, and the case was tried to a jury in September 2019.

¶5    At trial, the State introduced evidence that in January 2017, Ben, Allen, and Ben's brother, Dakota, were regularly using heroin. On the evening of January 30, 2017, Dakota drove Ben to a grocery store parking lot in Marshfield, Wisconsin, to purchase one gram of heroin from Staab, and in exchange, Ben gave Dakota a small amount of the heroin. Staab told Ben that the heroin was "very, very strong."

¶6    That night, after returning to his parents' home in Marathon County where he and Allen lived, Ben used "a very small amount" of the heroin—"barely anything" compared to what he would normally use—but he felt like he was "on the verge of overdosing" because of the drug's potency, which made him question whether the substance was "actual heroin." Dakota also used some of the heroin that Ben had given him that night. He described it as "potent" and "a lot more effective than any other thing" he had tried.

---

[3] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4), and following the parties' lead, we refer to the victims in this case using pseudonyms. Ben is the victim of the first-degree recklessly endangering safety charge, and Allen is the victim of the first-degree reckless homicide charge.

¶7      The next morning, Ben used the heroin again and overdosed, but he survived. Ben's father testified that when he went to wake Ben for work that morning, he found Ben lying motionless on the bathroom floor, with two needles and "a pack of something in some tinfoil" nearby. He threw the syringes and tinfoil away in a garbage can in the garage, and he told Ben that he had thrown away the remaining heroin.

¶8      Dakota subsequently arrived at his parents' home to drive with Ben and their father to their jobs at a farm supply company. While at the house, Dakota spoke with Allen, who told Dakota "that dad found [Ben] [o]n the bathroom floor and then he found the two needles and the packet of heroin." Dakota testified this conversation showed that Allen "was aware of what had occurred that morning."

¶9      While at work that day, Ben used a coworker's phone to text Dakota and ask him to contact Staab about obtaining more heroin. Dakota denied doing so, however, testifying that he knew that Ben "didn't have any money" and he "wasn't going to get put in the middle of that situation." At around 3:30 that afternoon, while making deliveries for work with a coworker, Ben stopped at his parents' home to search for the heroin that his father had discarded. He testified that he found the two syringes he had used that morning in a dumpster in the garage, but he did not find the remaining heroin. Ben testified that he then returned to work.

¶10     Dakota testified that he stopped at his parents' home for lunch on January 31, 2017. Following lunch, he took Allen along with him on a delivery for work, after which he took Allen back to his parents' house and then went back to work. He testified that he and Allen did not use or purchase heroin during that

time. Dakota claimed that after returning to work, he smoked the last of the heroin that he had received from Ben the prior evening. A family friend testified that she saw Dakota leaving his parents' home sometime between noon and 3:00 p.m. on January 31, but "[p]robably closer to 3-ish."

¶11 After Ben and Dakota finished their workday on January 31, they went back to their parents' home. Ben went into the basement and found Allen lying on his bed, unresponsive. Dakota called 911, and first responders arrived shortly thereafter. Allen was transported to a hospital, where he was pronounced dead. A medical examiner testified that Allen's cause of death was heroin and synthetic fentanyl toxicity.

¶12 On the evening of Allen's death, Dakota told investigators that Staab was Dakota's source of heroin. Dakota then agreed to assist law enforcement by purchasing heroin from Staab in a controlled buy. The controlled buy took place at Staab's residence at around 9:00 that evening. Dakota testified that after Staab sold him the heroin, he went directly to the police station and turned the heroin over to law enforcement. Dakota was searched by law enforcement both before and after the buy, and no heroin was found during either of those searches. Staab was taken into custody after the buy, and the buy money was found on her person.

¶13 A toxicologist testified that samples of Allen's blood taken after his death contained furanyl fentanyl (an illegally manufactured type of fentanyl), acryl fentanyl (another illegally manufactured type of fentanyl), caffeine, THC, and morphine. She further testified that 6-MAM was found in Allen's postmortem urine sample. The toxicologist explained that heroin has a "very short" detection window in the blood, after which it metabolizes into morphine and 6-MAM.

¶14    An analyst from the Wisconsin State Crime Laboratory in Wausau testified that the substance Dakota purchased from Staab during the controlled buy on the evening of Allen's death tested positive for heroin, furanyl fentanyl, acryl fentanyl, and caffeine. The analyst explained that caffeine is "not a common cutting agent with heroin samples." The analyst also testified that the Wausau laboratory had examined over 19,000 suspected controlled substances from 2010 to May 28, 2019, and "at least five" of those substances included a combination of furanyl fentanyl, heroin, acryl fentanyl, and caffeine. The analyst testified that all of the substances containing that mixture "were examined and received in 2017" and that the Wausau laboratory "received 2,742 cases for analysis" during 2017.

¶15    The jury found Staab guilty of first-degree reckless homicide and first-degree recklessly endangering safety. Based on a pretrial stipulation, the circuit court then found Staab guilty of the bail jumping charges. The court ultimately sentenced Staab to 12 years' initial confinement followed by 13 years' extended supervision on the first-degree reckless homicide count, with shorter concurrent sentences on the remaining charges.

¶16    Staab moved for postconviction relief, arguing that: (1) her conviction for first-degree reckless homicide must be vacated because WIS. STAT. § 940.02(2)(a) does not apply to the facts of this case; (2) the evidence at trial was insufficient to support her conviction for first-degree recklessly endangering safety; (3) the evidence was insufficient to establish venue in Marathon County for the first-degree recklessly endangering safety charge; and (4) the circuit court should grant her a new trial based on newly discovered evidence—namely, evidence suggesting that Krishna Ehrike may have been the source of the heroin that caused Allen's death. Staab later filed a supplemental postconviction motion asserting that: (1) her trial attorney was constitutionally ineffective by failing to

investigate Ehrike as an alternative source of the heroin and by failing to confront Dakota with certain text messages at trial; and (2) the court should grant her a new trial in the interest of justice.

¶17 The circuit court held an evidentiary hearing on Staab's postconviction motions, at which Staab's trial attorney was the only witness. The court subsequently denied all of Staab's postconviction claims in an oral ruling, which was later memorialized in a written order.

¶18 Staab now appeals her judgment of conviction and the order denying postconviction relief. Additional facts are included below as relevant to our discussion of the issues raised on appeal.[4]

## DISCUSSION

### I. Applicability of WIS. STAT. § 940.02(2)(a)

¶19 On appeal, Staab renews her argument that her conviction for first-degree reckless homicide must be vacated because WIS. STAT. § 940.02(2)(a) does not apply to the facts of this case. The interpretation and application of a statute present questions of law that we review independently. *State v. Langlois*, 2018 WI 73, ¶55, 382 Wis. 2d 414, 913 N.W.2d 812.

---

[4] We pause to note that Staab's appellate briefs do not comply with WIS. STAT. RULE 809.19(8)(bm), which requires a brief to "have page numbers centered in the bottom margin using Arabic numerals with sequential numbering starting at '1' on the cover." Our supreme court has explained that this pagination requirement "will match the page number to the page header applied by the eFiling system, avoiding the confusion of having two different page numbers." S. CT. ORDER 20-07, 2021 WI 37, 397 Wis. 2d xiii (eff. July 1, 2021). We admonish Staab's attorney that future violations of the Rules of Appellate Procedure may result in sanctions. *See* WIS. STAT. RULE 809.83(2).

¶20    When interpreting a statute, our objective "is to determine what the statute means so that it may be given its full, proper, and intended effect." *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. Our analysis begins with the plain language of the statute. *Id.*, ¶45. "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.* In addition, statutory language must be interpreted "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶46. "If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning." *Id.* (citation omitted).

¶21    Here, Staab argues that WIS. STAT. § 940.02(2)(a) "applies only to the death of someone who was on the receiving end of a delivery." She therefore asserts that § 940.02(2)(a) requires the State to prove that someone delivered the controlled substance directly to the deceased victim. Accordingly, Staab asserts that her conviction for first-degree reckless homicide must be vacated because the State did not prove that she—or anyone—delivered a controlled substance directly to Allen.[5]

---

[5] More specifically, Staab asserts that "[i]f the circumstances of Allen's death could not form the basis for a prosecution under WIS. STAT. § 940.02(2)(a) within the meaning of the law, then the [circuit] court lacked subject matter jurisdiction over the charge, and the judgment of conviction must be voided." As the State correctly notes, however, a circuit court "is never without subject matter jurisdiction." *See Village of Trempealeau v. Mikrut*, 2004 WI 79, ¶1, 273 Wis. 2d 76, 681 N.W.2d 190.

¶22    The plain language of WIS. STAT. § 940.02(2)(a) does not support Staab's argument.   Section 940.02(2)(a) does not require the State to prove that anyone delivered the fatal dose of drugs directly to the deceased victim.   Instead, the statute states that anyone who "causes the death of another human being" "[b]y … delivery, in violation of [WIS. STAT. §] 961.41, of a controlled substance" is guilty of a Class B felony.   Sec. 940.02(2)(a).   Thus, to obtain a conviction, the State is required to prove the following five elements: (1) the defendant delivered a substance; (2) the substance was (or contained) a controlled substance; (3) the defendant knew or believed that the substance was (or contained) a controlled substance; (4) the victim used the substance; and (5) the victim died as a result of the use of the substance.   WIS JI—CRIMINAL 1021 (2024).

¶23    None of these elements require that the fatal dose of drugs was delivered by the defendant, or anyone else, directly to the deceased victim. Instead, the statute merely requires that the defendant delivered a controlled substance and that the victim later used that substance and died as a result.   We agree with the State that Staab's interpretation of the statute "is attempting to add an extra element to the statute that simply does not exist."   It is the role of the legislature, not this court, to define the elements of a crime.   *See* ***State v. Warbelton***, 2009 WI 6, ¶22, 315 Wis. 2d 253, 759 N.W.2d 557; *see also* ***Fond Du Lac County v. Town of Rosendale***, 149 Wis. 2d 326, 334, 440 N.W.2d 818 (Ct. App. 1989) ("One of the maxims of statutory construction is that courts should not add words to a statute to give it a certain meaning.").

¶24    Furthermore, as the State notes, the legislature has expressly provided that WIS. STAT. § 940.02(2)(a) applies "[t]o any distribution or delivery described in this paragraph, *regardless of whether the distribution or delivery is made directly to the human being who dies*" and that "each person who distributes

9

or delivers the controlled substance or controlled substance analog in violation of [WIS. STAT. §] 961.41 is guilty under this paragraph." *See* § 940.02(2)(a)3. (emphasis added). We agree with the State that this language further shows that the legislature intended to criminalize the delivery of a controlled substance that results in a person's death, regardless of whether the defendant, or anyone else, delivered the controlled substance directly to the deceased victim.

¶25 In arguing to the contrary, Staab notes that WIS. STAT. § 940.02(2)(a) applies when a victim dies as a result of using a controlled substance that the defendant delivered "in violation of [WIS. STAT. §] 961.41." Staab then notes that, for purposes of § 961.41, "delivery" means "the actual, constructive or attempted transfer from one person to another of a controlled substance." *See* WIS. STAT. § 961.01(6). Based on this definition and "the interplay between § 940.02(2)(a) and § 961.41," Staab argues "it is clear that first-degree reckless homicide applies only to the death of someone who was on the receiving end of a delivery."

¶26 We disagree. While WIS. STAT. § 940.02(2)(a) requires that the defendant delivered a controlled substance in violation of WIS. STAT. § 961.41, and while delivery requires the actual, constructive, or attempted transfer of a controlled substance from one person to another, nothing in either of these statutes requires the State to prove that a controlled substance was delivered directly to the deceased victim in order to obtain a conviction under § 940.02(2)(a).

¶27 Furthermore, we note that the evidence in this case was clearly sufficient to satisfy the delivery element of WIS. STAT. § 940.02(2)(a). Specifically, the State presented evidence at trial that Staab delivered heroin to Ben on January 30, 2017, in violation of WIS. STAT. § 961.41. Although the State

did not prove that Staab, Ben, or anyone else subsequently delivered any of that heroin to Allen, as discussed above, § 940.02(2)(a) did not require the State to do so. Instead, the State merely needed to prove that Staab delivered heroin in violation of § 961.41, that Allen later used the heroin, and that Allen's use of the heroin caused his death. The evidence at trial was sufficient for the jury to find each of those elements beyond a reasonable doubt.

¶28 Staab also asserts that WIS. STAT. § 940.02(2)(a) does not apply here because the legislature chose to limit homicide liability under § 940.02(2)(a) "to those who delivered the substance," as opposed to anyone who merely possessed the substance prior to the deceased victim. Staab did not, however, merely possess the heroin at issue in this case prior to Allen's death. Rather, as discussed above, Staab delivered the heroin to Ben.

¶29 Finally, Staab argues that "the rule of lenity supports interpreting WIS. STAT. § 940.02(2)(a) to apply only to overdose deaths of those on the receiving end of a delivery." The rule of lenity, however, "applies if a 'grievous ambiguity' remains after a court has determined the statute's meaning by considering statutory language, context, structure and purpose, such that the court must 'simply guess' at the meaning of the statute." *State v. Guarnero*, 2015 WI 72, ¶27, 363 Wis. 2d 857, 867 N.W.2d 400 (citations omitted). No such "grievous ambiguity" exists in this case. As explained above, § 940.02(2)(a) contains five elements, and the direct delivery of a controlled substance to the deceased victim is not one of those elements.

¶30 For these reasons, we reject Staab's argument that her conviction for first-degree reckless homicide must be vacated because WIS. STAT. § 940.02(2)(a) does not apply to the facts of this case.

11

## II. Sufficiency of the evidence

¶31 Next, Staab argues that the evidence at trial was insufficient to support her conviction for first-degree recklessly endangering safety. Whether the evidence was sufficient to sustain a guilty verdict in a criminal prosecution is a question of law that we review independently. *State v. Smith*, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410.

¶32 A defendant "bears a heavy burden in attempting to convince a reviewing court to set aside a jury's verdict on insufficiency of the evidence grounds." *State v. Booker*, 2006 WI 79, ¶22, 292 Wis. 2d 43, 717 N.W.2d 676. When reviewing the sufficiency of the evidence to support a conviction, an appellate court "may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990).

¶33 It is the function of the jury, not this court, to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* at 506. "Thus, when faced with a record of historical facts which supports more than one inference, an appellate court must accept and follow the inference drawn by the trier of fact unless the evidence on which that inference is based is incredible as a matter of law." *Id.* at 506-07. Ultimately, if any possibility exists that the jury could have drawn the appropriate inferences from the evidence adduced at trial to find the defendant guilty, then we may not overturn the jury's verdict, even if we believe the jury should not have found guilt based on the evidence before it. *Id.* at 507.

¶34 To convict Staab of the recklessly endangering safety charge, the State needed to prove: (1) that Staab endangered Ben's safety; (2) that Staab endangered Ben's safety by criminally reckless conduct; and (3) that the circumstances of Staab's conduct showed utter disregard for human life. *See* WIS JI—CRIMINAL 1345 (2020); *see also* WIS. STAT. § 941.30(1). Staab does not dispute that the evidence at trial was sufficient to establish the first two elements of this offense. She argues, however, that the evidence was insufficient to prove that she acted with utter disregard for human life.

¶35 Utter disregard for human life "requires more than a high degree of negligence or recklessness. To evince utter disregard, the mind must not only disregard the safety of another but be devoid of regard for the life of another." ***State v. Geske***, 2012 WI App 15, ¶11, 339 Wis. 2d 170, 810 N.W.2d 226 (citation omitted). Factors relevant to the analysis include "what the defendant was doing; why the defendant was engaged in that conduct; how dangerous the conduct was; how obvious the danger was; and whether the conduct showed any regard for life." ***Id.*** The ultimate question is whether, considering the totality of the circumstances, "the defendant showed some regard for life." ***Id.*** (citation omitted).

¶36 Staab argues that she showed some regard for Ben's life "[b]ecause [she] warned [him] about the potency of the heroin." We agree with the State, however, that Staab's argument in this regard is merely an attempt to relitigate the jury's factual findings. Under the totality of the circumstances, there was more than enough evidence for the jury to find that Staab acted with utter disregard for human life, despite Staab's comment about the strength of the heroin.

¶37 As the circuit court correctly noted when denying Staab's postconviction motion, heroin is a "lethal substance." Moreover, as the State

notes, Staab sold not only heroin, but heroin laced with two different types of fentanyl and caffeine. Thus, as the State argues, Staab "knew the substance was extremely dangerous, she knew she was selling it to someone who was addicted to it, and she knew she could not control how or where he would ingest it." In addition, the State correctly observes that Staab's statement to Ben that the heroin was very strong could be interpreted to show that Staab "knew this particular batch of heroin was even more dangerous than usual, yet chose to sell it anyway," which "actually cuts against [Staab's] argument" that her conduct showed some regard for Ben's life.

¶38 Furthermore, while Staab asserts that her comment about the heroin being very strong shows that she was concerned for Ben's safety, we agree with the State that another reasonable interpretation of that comment is that Staab was bragging about the quality of her product. The jury was free to draw that inference and was not required to accept the contrary inference, advanced by Staab, that her comment was intended as a warning. *See Poellinger*, 153 Wis. 2d at 506-07. Consequently, we reject Staab's argument that the evidence at trial was insufficient to support her conviction for first-degree recklessly endangering safety.

### III. Venue

¶39 Staab next argues that her conviction for first-degree recklessly endangering safety must be vacated because Marathon County was not a proper venue for that charge. "Although venue is not an element of a crime, it nonetheless must be proved beyond a reasonable doubt." *State v. Schultz*, 2010 WI App 124, ¶12, 329 Wis. 2d 424, 791 N.W.2d 190. "We will not reverse a conviction based upon the State's failure to establish venue unless the evidence,

viewed most favorably to the state and the conviction, is so insufficient that there is no basis upon which a trier of fact could determine venue beyond a reasonable doubt." ***State v. Corey J.G.***, 215 Wis. 2d 395, 407-08, 572 N.W.2d 845 (1998).

¶40    "Criminal actions shall be tried in the county where the crime was committed, except as otherwise provided." WIS. STAT. § 971.19(1).  "Where 2 or more acts are requisite to the commission of any offense, the trial may be in any county in which any of such acts occurred."  *See* § 971.19(2).  Stated differently, where a crime has two or more elements, venue is proper in any county where any element of the crime occurred.  *See **State v. Swinson***, 2003 WI App 45, ¶21, 261 Wis. 2d 633, 660 N.W.2d 12 (concluding that Sheboygan County was a proper venue for a theft by fraud charge because "at least one of the elements occurred in Sheboygan [C]ounty").

¶41    Staab argues that recklessly endangering safety is an "instantaneous crime" and was complete "[o]nce the heroin changed hands."  Because the heroin delivery occurred in the portion of Marshfield located in Wood County, Staab asserts that "venue for the charge of recklessly endangering safety was proper only in Wood County."[6]

¶42    We reject Staab's assertion that first-degree recklessly endangering safety is an instantaneous offense and was therefore complete as soon as she delivered the heroin to Ben.  As noted above, one of the elements of the first-degree recklessly endangering safety charge required the State to prove that

---

[6] Staab does not dispute that venue for the first-degree reckless homicide charge was proper in Marathon County.  *See* WIS. STAT. § 971.19(5) ("If the act causing death is in one county and the death ensues in another, the defendant may be tried in either county.").

Staab endangered Ben's safety by criminally reckless conduct. *See* WIS JI—CRIMINAL 1345 (2020). Conduct is criminally reckless when "the actor creates an unreasonable and substantial risk of death or great bodily harm to another human being and the actor is aware of that risk." WIS. STAT. § 939.24(1).

¶43 As the State correctly notes, "Ben's safety did not cease to be endangered the moment he obtained the heroin from Staab. That is just when the danger began. Ben was continually endangered by his subsequent possession and use of the lethal substance in Marathon County." Indeed, the very fact that Ben later overdosed in Marathon County after using the heroin that he purchased from Staab demonstrates that the offense was not instantaneous because it shows that Staab's conduct continued to endanger Ben's safety beyond the specific moment when the delivery occurred.

¶44 In support of her argument that venue in Marathon County was not proper, Staab cites a single case, *John v. State*, 96 Wis. 2d 183, 188, 291 N.W.2d 502 (1980), where our supreme court stated that "a continuing offense is one which consists of a course of conduct enduring over an extended period of time." However, it is not self-evident how *John*, a public assistance fraud case, is relevant to the venue question at issue here. While this case does not involve a "course of conduct" by Staab, as explained above, the evidence at trial clearly showed that Staab's conduct continued to endanger Ben after he returned to Marathon County. Thus, at least one element of the crime occurred in Marathon County, and venue in Marathon County was therefore proper.

¶45 We also find the State's reliance on *State v. Elverman*, 2015 WI App 91, 366 Wis. 2d 169, 873 N.W.2d 528, persuasive. In *Elverman*, the defendant was convicted of theft after he unlawfully wrote checks on a client's

16

behalf and cashed them for his own benefit. *Id.*, ¶¶2-4. On appeal, the defendant argued that venue was improper in Milwaukee County because the two checks at issue were neither signed nor cashed in Milwaukee County. *Id.*, ¶37. We concluded that venue was proper in Milwaukee County based on a continuing course of conduct that involved other actions by the defendant in Milwaukee County. *Id.*, ¶38. Alternatively, however, we stated that even considering only the two checks, "venue in Milwaukee County was proper, as there was trial testimony regarding the involvement of M & I Bank's Brown Deer processing center, which is located in Milwaukee County, in the negotiation of checks cashed at any of M & I Bank's branch locations." *Id.*, ¶38 n.12.

¶46 We agree with the State that if the involvement of a check processing center in Milwaukee County was sufficient to establish venue in Milwaukee County in *Elverman*, then Ben's use in Marathon County of the heroin that Staab sold him in Wood County was sufficient to establish venue in Marathon County for the first-degree recklessly endangering safety charge in this case. Accordingly, and for all of the reasons explained above, we reject Staab's argument that Marathon County was not a proper venue for that charge.

## IV. Newly discovered evidence

¶47 Staab next argues that the circuit court should have granted her a new trial based on newly discovered evidence suggesting that Krishna Ehrike may have been the source of the heroin that caused Allen's death.[7]

¶48 To obtain a new trial based on newly discovered evidence, a defendant must prove four factors: "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." *State v. Plude*, 2008 WI 58, ¶32, 310 Wis. 2d 28, 750 N.W.2d 42 (citation omitted). If the defendant makes this showing, the court must then determine whether there is a reasonable probability that, had the jury heard the newly discovered evidence, it would have had a reasonable doubt as to the defendant's guilt. *Id.*

¶49 The decision to grant or deny a motion for a new trial based on newly discovered evidence is committed to the circuit court's discretion. *Id.*, ¶31. Whether there is a reasonable probability of a different result, however, is a question of law that we review independently. *Id.*, ¶33.

¶50 In her postconviction motion, Staab asserted that on January 31, 2017, after Ben and Dakota's father disposed of the remaining heroin that Ben had purchased the night before, Dakota "exchanged several text messages with

---

[7] Staab's newly discovered evidence argument appears to pertain only to her conviction for first-degree reckless homicide. While Staab asserts that the new evidence suggests that Ehrike may have been the source of the heroin that caused Allen's death, she does not appear to dispute that she sold heroin to Ben on January 30, 2017, which caused Ben's overdose the following morning.

'Dustin' in which Dakota made statements indicating that the heroin he had was 'all gone' and that he or his brother had obtained more heroin from an unnamed female source."[8] Staab further asserted that, before trial, she had identified Ehrike "as a female heroin user and seller known to [Ben and Dakota] who could have been the source of this heroin." Staab additionally alleged that her trial attorney hired a private investigator to interview Ehrike, that the investigator located Ehrike's address and confirmed that she lived there, but that "Ehrike was not physically located and did not respond to [the investigator's] requests for interviews."

¶51 According to Staab's postconviction motion, following Staab's conviction, another private investigator, Vicki Harness, interviewed Ehrike twice, and Ehrike also "sought and had repeated contact with Staab's mother." During the first interview with Harness, Ehrike stated that she and her boyfriend, Dominic Perrine, were selling heroin during 2016 and 2017 and, specifically, had sold and used heroin with both Ben and Dakota during that time. Ehrike told Harness that "it could have been her or [Staab] or [Perrine] who sold heroin to Dakota … in January 2017." Ehrike also stated that Ben "would drive her and [Perrine] to their dealer in Milwaukee to get heroin" and that Perrine and Staab "obtained heroin from the same dealer in Milwaukee." During her second interview with Harness, Ehrike stated that "it was not her or [Perrine] or [Staab] who sold the heroin to Dakota … and she did not know who did."

---

[8] Staab conceded in her postconviction motion that these text messages were provided to the defense prior to trial.

¶52 Staab's postconviction motion further alleged that Harness interviewed Staab's mother, who reported that Ehrike told her that Ehrike and Perrine were selling "dope" to Ben and Dakota; that Ehrike and Perrine were getting their heroin from the same source in Milwaukee as Staab; that Perrine broke up with Ehrike and moved to Stevens Point two weeks after Allen's death because he "was worried about getting caught up in [Allen's] death"; and that "it wasn't [Ehrike] that sold drugs to Dakota or [Ben]" and "it must have been Perrine."

¶53 The postconviction motion further alleged that Harness interviewed Dakota, who "confirmed that he knew Ehrike, that he bought heroin from her boyfriend, [Perrine], and that he hasn't spoken to or seen Ehrike since [Allen's] death." In addition, the motion recounted that another investigator, Lisann Clayton, had interviewed Ben, who stated that he knew Ehrike through Perrine; that Perrine was one of Ben's heroin dealers; that Ben had used with Ehrike "a few times"; and that Dakota had used with Allen on the afternoon of the day Allen died.

¶54 Staab argued that Ehrike's statements qualified as newly discovered evidence because they were obtained after Staab's conviction, Staab was not negligent in seeking the evidence, the statements were material to an issue in the case, and the statements were not cumulative as to any other evidence. Regarding materiality, in particular, Staab argued that Ehrike's statements identified her as a potential source of heroin for Ben, Dakota, and Allen.

¶55 Staab also argued that there was a reasonable probability that a jury, considering both the old evidence and Ehrike's statements, would have a

20

reasonable doubt as to Staab's guilt because the new evidence supported a "reasonable hypothesis … consistent with Staab's innocence"—namely, that

> [b]y late morning on [January 31, 2017], [Ben] was desperate for heroin and asked Dakota to contact Staab, but he had no money. Because of [Ben's] money issue, Dakota did not contact Staab. Dakota was out of heroin, likely because he had used the rest of the small amount [Ben] had given him the night before. Not wanting to contact Staab, he contacted another heroin source of theirs, Krishna Ehrike. Ehrike had the same source of supply as Staab, and [Ben] had traveled with Ehrike to Milwaukee before to obtain heroin from that supplier. She lived close by in Stratford, close enough for either of the … brothers to meet during the workday, as they drove around the area as part of their job. Dakota would pool money with [Allen] to obtain heroin, and he would have had an opportunity to do so when he was with [Allen] over the lunch hour. Dakota and/or [Ben] obtained additional heroin through Ehrike and Dakota had it when he was at his parents' home to pick up his mother's car and was observed by [their family friend]. He gave some of this heroin to [Allen] and went back to work where he used some of it himself. [Allen] used the heroin Dakota gave him and was found shortly thereafter by [Ben] when he got home from work. Given [Ben's] postconviction statement, it is also reasonable to conclude that Dakota and [Allen] used together before Dakota went back to work.

¶56    The circuit court rejected Staab's newly discovered evidence claim. Applying the first and second factors under the first part of the newly discovered evidence analysis, the court acknowledged that Ehrike's statements were discovered after Staab's conviction and stated, "It's hard for this court to find negligence in obtaining this information if there was an attempt to do it." *See **Plude***, 310 Wis. 2d 28, ¶32.  The court concluded, however, that Staab had failed to satisfy the third factor because the new evidence was not material to an issue in the case.  *See **id.***

21

¶57    Specifically, the circuit court determined that the new evidence was not material because it would not have been admissible under the **Denny** test for third-party perpetrator evidence, as Staab had not shown a "legitimate tendency" that Ehrike could have committed the crime.  *See **State v. Denny***, 120 Wis. 2d 614, 623, 357 N.W.2d 12 (Ct. App. 1984).  The court also concluded there was no reasonable probability that the new evidence would have created a reasonable doubt as to Staab's guilt.

¶58    We agree with the circuit court that Staab failed to establish that the new evidence was material to an issue in the case because the evidence would not have been admissible under **Denny**.  **Denny** provides that in order to admit third-party perpetrator evidence, a defendant must show "a 'legitimate tendency' that the third person could have committed the crime."  **Id.** (citation omitted).  The **Denny** test "requires more than mere possibility."  ***State v. Wilson***, 2015 WI 48, ¶83, 362 Wis. 2d 193, 864 N.W.2d 52.  "[E]vidence that simply affords a possible ground of suspicion against another person should not be admissible."  **Denny**, 120 Wis. 2d at 623.

¶59    To satisfy the **Denny** test, a defendant must first show that the alleged third-party perpetrator had "a plausible reason to commit the crime." ***Wilson***, 362 Wis. 2d 193, ¶57.  "This is the motive prong" of the **Denny** test. ***Wilson***, 362 Wis. 2d 193, ¶57.

¶60    Second, under the "opportunity prong" of the **Denny** test, a defendant must show that the third party "could … have committed the crime, directly or indirectly."  ***Wilson***, 362 Wis. 2d 193, ¶58.  Stated differently, the defendant must show "a practical possibility that the third party committed the crime."  **Id.**  This often amounts to a showing that the third party was at the crime

scene or in the vicinity when the crime was committed. *Id.*, ¶65. In most cases, "a defendant will need to show more than an unaccounted-for period of time to implicate a third party." *Id.*, ¶68.

¶61    Finally, the third prong of the *Denny* test—the direct connection prong—requires the defendant to present evidence "that the alleged third-party perpetrator actually committed the crime, directly or indirectly." *Wilson*, 362 Wis. 2d 193, ¶59. This evidence "should firm up the defendant's theory of the crime and take it beyond mere speculation." *Id.* A circuit court "must assess the proffered evidence in conjunction with all other evidence to determine whether, under the totality of the circumstances, the evidence suggests that a third-party perpetrator *actually committed* the crime." *Id.*, ¶71. A third party's self-incriminating statement or exclusive control of the weapon used in a crime may establish a direct connection; however, the third party's mere presence at the crime scene or acquaintance with the victim is not normally sufficient to do so. *Id.*, ¶72.

¶62    Here, the State concedes—and we agree—that Staab has satisfied the motive prong of the *Denny* test because Ehrike had a plausible motive for selling heroin to Ben, Dakota, or Allen on January 31, 2017—namely, financial gain. We also agree with the State, however, that Staab has failed to satisfy the opportunity and direct connection prongs of the *Denny* test.

¶63    With respect to the opportunity prong, Staab argues the evidence would establish that Ehrike "was within sufficient proximity to be able to conduct the transaction" on January 31, 2017, because she was living in Stratford at that time, which is approximately 13 miles from Ben and Dakota's parents' home. Staab further argues that the evidence at trial showed that both Dakota and Ben

"drove around the area for work" on January 31, that Dakota took Allen with him on a work delivery that afternoon, and that Dakota was seen at his parents' house at about 3:00 p.m. Staab also notes that a criminal complaint filed against Ehrike in September 2018 alleged that Ehrike had sold heroin from her residence in July 2017. According to Staab, this evidence shows that Ehrike "had the requisite skill, capacity or ability to carry out a delivery, i.e.[,] she had 'opportunity.'"

¶64 We disagree. Staab has merely shown that Ehrike lived about 13 miles from Ben and Dakota's parents' residence and was dealing heroin from her home during the same general time period when the crime at issue in this case was committed. However, Staab has not provided any information about Ehrike's whereabouts or schedule on January 31, 2017, to show that Ehrike actually had the opportunity to sell heroin to Ben, Dakota, or Allen that day. We agree with the State that "[t]he mere fact that Ehrike resided in a town near the one in which the crime was committed does not come close to showing opportunity under *Denny*."

¶65 As for the direct connection prong, Staab's new evidence merely shows that Ehrike was one of multiple individuals who sold heroin to Ben and Dakota during the general timeframe at issue in this case. Notably, during her first interview with Harness, Ehrike merely stated that it "could have been" Ehrike, Perrine, or Staab who sold heroin to Dakota "in January 2017." This speculative statement that Ehrike was one of three people who "could have" sold heroin to Dakota sometime during January 2017 does not show a direct connection between Ehrike and the sale of the heroin that caused Allen's death on January 31, 2017.[9]

---

[9] Ehrike's alleged statements to Staab's mother that "it wasn't [Ehrike] that sold drugs to Dakota or [Ben]" and "it must have been Perrine" are similarly speculative and do not show a direct connection between Ehrike and the crime.

Moreover, during her second interview with Harness, Ehrike disavowed her prior statement, asserting instead that "it was not her or [Perrine] or [Staab] who sold the heroin to Dakota … and she did not know who did."

¶66 Staab urges us to consider Ehrike's statements in context with Dakota's text messages from January 31, 2017, which Staab contends show that Dakota "was involved in a heroin transaction with a female source during the afternoon of" that day. We agree with the State and the circuit court, however, that the text messages do not show that Dakota actually purchased heroin from a female source on January 31, only that he wanted to. As the circuit court noted:

> Much of the text messages were done in misspelled words or shorthand. It wasn't clear what anybody was doing, and it wasn't certainly clear who they were talking about or whether in fact a transaction had occurred or not. It was just an exchange between individuals speaking in almost a coded language that was hard to understand about trying to purchase some heroin or getting money together to get more heroin because the heroin had already been thrown out.

We agree with the circuit court's assessment of the text messages' contents.

¶67 Because Staab has not shown that her new evidence involving Ehrike's alleged involvement in the crime would have been admissible under *Denny*, we agree with the circuit court that the evidence was not material for purposes of the newly discovered evidence test. In addition, we conclude that even if Staab had satisfied all four prongs of the initial part of the newly discovered evidence test, she still would not be entitled to a new trial because there is no reasonable probability that the new evidence would have created a reasonable doubt as to her guilt. *See Plude*, 310 Wis. 2d 28, ¶32.

25

¶68    At trial, the State presented strong evidence of Staab's guilt. The jury heard that Staab sold unusually strong heroin to Ben on the night of January 30, 2017, some of which Ben gave to Dakota. The jury also heard that Ben overdosed on this heroin and that his father threw the remaining heroin into a garbage can. When law enforcement searched that garbage can shortly after Allen's overdose, the heroin was gone, creating a strong inference that Allen had used it. Additionally, the testimony from both Ben and Dakota regarding the unusual strength of the heroin from Staab, and the testimony about Ben's overdose on the morning of January 31, further supported an inference that Allen had overdosed on the same heroin, as the jury could reasonably infer that the heroin's potency would make an overdose more likely.

¶69    Moreover, the jury also heard that Staab sold Dakota heroin on the night of January 31, 2017, in a controlled buy. That heroin was tested and was found to contain an unusual combination of heroin, furanyl fentanyl, acryl fentanyl, and caffeine, and the same substances were detected in Allen's blood and urine following his death. This evidence further supported the State's theory that the heroin that killed Allen was the same heroin that Ben had purchased from Staab on the evening of January 30.

¶70    Staab's proffered new evidence, in contrast, consists of Ehrike's initial, speculative statement that she, Staab, or Perrine "could have" sold heroin to Dakota in January 2017, and her subsequent, contradictory statement that neither she nor Perrine sold "the heroin" to Dakota, and she did not know who did. In light of the State's strong evidence of Staab's guilt, we conclude that these contradictory statements, which provide no definitive answer as to who sold the heroin that killed Allen, do not create a reasonable probability that a jury, considering both the old and new evidence, would have a reasonable doubt as to

26

Staab's guilt. We therefore reject Staab's argument that the circuit court erred by denying her motion for a new trial based on newly discovered evidence.

## V. Ineffective assistance of trial counsel

¶71     Staab also seeks a new trial based on ineffective assistance of trial counsel. She contends that her trial attorney was constitutionally ineffective by: (1) failing to adequately investigate Ehrike as an alternative source of the heroin that caused Allen's death; and (2) failing to confront Dakota with his text messages "describing an additional heroin deal with a female source on the day of Allen's death."

¶72     "Whether a defendant was denied effective assistance of counsel is a mixed question of law and fact." *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93. "The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous; whether counsel's conduct constitutes ineffective assistance is a question of law, which we review de novo." *Id.*

¶73     To prevail on an ineffective assistance claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, the defendant must point to specific acts or omissions by counsel that are "outside the wide range of professionally competent assistance." *Id.* at 690. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. If a

defendant fails to make a sufficient showing on one prong of the *Strickland* test, we need not address the other. *Id.* at 697.

¶74 Here, assuming without deciding that Staab's trial attorney performed deficiently in both of the ways asserted by Staab, we conclude that Staab has failed to show that counsel's alleged errors prejudiced her defense. With respect to trial counsel's investigation of Ehrike as a potential source of the heroin that caused Allen's death, we have already concluded, in our analysis of Staab's newly discovered evidence claim, that the evidence discovered when Ehrike was interviewed after trial would not have been admissible under *Denny*. In addition, even if the evidence would have been admissible, we have already concluded that there is no reasonable probability the evidence would have caused a jury to have a reasonable doubt as to Staab's guilt. For the same reasons, for purposes of Staab's ineffective assistance claim, there is also no reasonable probability that the result of the proceeding would have been different but for counsel's alleged error in failing to adequately investigate Ehrike prior to trial.

¶75 As for trial counsel's failure to confront Dakota with his text messages from January 31, 2017, we agree with the State that Staab overstates the evidentiary value of those messages by asserting that they definitively show that Dakota purchased heroin from a female source on January 31. Instead, as discussed above, we agree with the circuit court's assessment that it is not "clear" from the messages "whether in fact a transaction had occurred or not." Furthermore, as the circuit court aptly noted, the messages may actually have harmed Staab's defense, as they indicated that Dakota was trying to purchase heroin from an unnamed female source on the day of Allen's death, and Staab was a female source from whom Ben and Dakota had recently purchased heroin. The fact that Ben had texted Dakota that morning specifically asking him to contact

Staab about purchasing more heroin would have further supported an inference that Staab was the unnamed female source referenced in Dakota's text messages.

¶76 As the State concedes, Dakota's text messages did suggest, contrary to Dakota's trial testimony, that he attempted to sell some of his remaining heroin for $20 on January 31. Nevertheless, we agree with the State that there is no reasonable probability that this "tangential piece of impeachment evidence against Dakota's credibility" would have changed the outcome of Staab's trial, particularly given the multiple other ways in which Dakota's credibility was challenged at trial. "Where the credibility of a prosecution witness was tested at trial, evidence that again attacks the credibility of that witness is cumulative." *State v. McAlister*, 2018 WI 34, ¶39, 380 Wis. 2d 684, 911 N.W.2d 77.

¶77 Because Staab has failed to show that she was prejudiced by her trial attorney's alleged errors, she cannot prevail on her ineffective assistance of trial counsel claim. As such, the circuit court properly declined to grant her a new trial on that basis.

## VI. New trial in the interest of justice

¶78 Finally, Staab asks this court to award her a new trial in the interest of justice. We have discretion to grant a new trial in the interest of justice "if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried." WIS. STAT. § 752.35. However, our discretionary reversal power is reserved for exceptional cases, *State v. McKellips*, 2016 WI 51, ¶52, 369 Wis. 2d 437, 881 N.W.2d 258, and "should be exercised sparingly and with great caution," *State v. Williams*, 2006 WI App 212, ¶36, 296 Wis. 2d 834, 723 N.W.2d 719.

¶79    Staab seeks a new trial in the interest of justice on the ground that the real controversy was not fully tried. Situations where the real controversy was not fully tried include those where the jury "was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case" or "had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried." *State v. Hicks*, 202 Wis. 2d 150, 160, 549 N.W.2d 435 (1996).

¶80    Staab argues that the real controversy was not fully tried in this case for two reasons. First, she asserts that the jury was not given the opportunity to hear "the Ehrike and text message evidence." (Formatting altered.) This argument, however, merely rehashes Staab's prior claims for a new trial based on newly discovered evidence and ineffective assistance of trial counsel. We have already rejected those claims, and based on our analysis above, they provide no reason to grant Staab a new trial in the interest of justice. *See State v. Ferguson*, 2014 WI App 48, ¶33, 354 Wis. 2d 253, 847 N.W.2d 900 (rejecting a claim for a new trial in the interest of justice that "merely rehashe[d] contentions that we ha[d] already rejected").

¶81    Second, Staab asserts that the jury "heard improperly admitted evidence about the chemical makeup of the drugs Staab sold, which clouded the crucial issue of the source of the fatal dose." (Formatting altered.) As noted above, an analyst testified at trial that the Wausau crime laboratory examined over 19,000 suspected controlled substances from 2010 to May 28, 2019, and "at least five" of those substances included a combination of furanyl fentanyl, heroin, acryl fentanyl, and caffeine. Staab argues that this testimony was "woefully misleading" because "one would clearly not expect to find a combination of fentanyl in other controlled substances such as, for example, marijuana." She

therefore argues that "the number of times this combination of substances appeared when compared against analyses of all controlled substances was not probative of the relative obscurity of this combination," and "for such a data analysis to be remotely probative or meaningful of how rare this combination of substances was, the relevant data set would be how many times this combination of substances appeared in analyses of heroin and/or fentanyl."

¶82    Staab also complains that the analyst testified that the relevant combination of substances appeared in "at least five" samples, "which is a non-specific number." In addition, she notes that the analyst "was unable to testify when in 2017 the tested samples were seized or where they were seized from." For all of these reasons, Staab asserts that the analyst's testimony on this point was not relevant and, therefore, was not properly admitted.

¶83    "Evidence which is not relevant is not admissible." WIS. STAT. § 904.02. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01.

¶84    The analyst's testimony satisfied the relevancy test. The evidence at trial showed that Staab sold a substance to Dakota during a controlled buy on January 31, 2017, following Allen's death, and that substance contained a mixture of furanyl fentanyl, heroin, acryl fentanyl, and caffeine. The evidence further showed that Allen's blood and urine contained a mixture of those same four substances. Under these circumstances, the analyst's testimony that the same combination was found in only about five of 19,000 suspected controlled substances tested over an approximately ten-year period tended to make it more probable that the heroin on which Allen overdosed came from Staab. While the

analyst could have been more precise by comparing the number of samples containing this particular combination of substances to the total number of heroin or fentanyl samples tested, as opposed to the total number of all suspected controlled substances tested, that consideration merely goes to the weight of the evidence, not its admissibility.

¶85 Additionally, the State notes that the analyst misspoke when she testified that the number of samples containing the particular combination at issue in this case was "at least five." Citing its notice of expert testimony submitted to the circuit court prior to trial, the State asserts that "[t]he correct number was five." We agree with the State that the analyst's "brief misspeak benefitted Staab by leaving room for an inference that the number may have been greater than five." Regardless, the fact that the analyst testified that "at least five" samples contained the combination of substances at issue in this case, instead of providing a specific number, again goes to the weight of the analyst's testimony, rather than its admissibility.

¶86 Consequently, we reject Staab's argument that the analyst's testimony was irrelevant and, therefore, improperly admitted. Accordingly, Staab has failed to show either that the jury "was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case" or that it "had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried." *See Hicks*, 202 Wis. 2d at 160. As such, this is not the type of exceptional case warranting discretionary reversal under WIS. STAT. § 752.35. *See McKellips*, 369 Wis. 2d 437, ¶52.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.